In re William H. LEWIS, Debtor.

William H. LEWIS, Plaintiff,

v.

Ralph I. MALOON, Trustee of April Realty Trust, John Burgess and Anne Burgess, Defendants.

William H. LEWIS, Plaintiff,

v.

Thomas L. McDONALD and John Burgess, Defendants.

William H. Lewis, Plaintiff,

v.

GASTON & SNOW, Thomas L. McDonald and Ralph I. Maloon, Trustee, April Realty Trust, Defendants.

William H. LEWIS, Plaintiff,

v.

John BURGESS, Chrysalis, Inc. and Anne Burgess, Defendants.

In re LEEDHAM FARM CONDOMINIUMS, A Partnership of Which John Burgess and William H. Lewis are Alleged Co–Partners, Alleged Debtor.

Bankruptcy Nos. 88–10828–HL, 88–11346–HL.

Adv. Nos. 88–1240, 88–1266, 88–1252 and 88–1253.

United States Bankruptcy Court, D. Massachusetts.

Nov. 18, 1988.

790

Sumner Darman, Richard Blumenthal, Silverman & Kudisch, Boston, Mass., for debtor.

John Esher, Nancy Blueweiss, Riemer & Braunstein, Boston, Mass., for John Burgess.

Russell D. Raskin, Raskin & Berman, Providence, R.I., for Thomas McDonald.

William Hewig, III, Gaston & Snow, Boston, Mass., for Gaston & Snow.

## MEMORANDUM

HAROLD LAVIEN, Bankruptcy Judge.

This twisted tale begins in 1987 when Mr. Burgess, an experienced real estate developer, found a piece of property on Pond Street in Attleboro, Massachusetts suitable for condominium development. Mr. Burgess approached Mr. Lewis, an experienced builder, with a deal, somewhat similar to other deals they had participated in. Burgess would buy the property and, in turn, sell it to Lewis for condominium development after Burgess had obtained town approval for 27 condominiums. The venality of both parties has turned these seemingly simple transactions—by privately incorporating a deal for Burgess to buy 14 units at a fixed price—into a tangled mess of knots which the Court, even now, can only partially unravel. Some of the snarls defy logic while some of the others, despite obscurant testimony, unfold because only one conclusion lends itself to an inescapable logical reasonableness.

The sale of the property on Pond Street, also known as Leedham Farms, from Mr. Burgess to Mr. Lewis was evidenced by three different signed purchase and sale agreements.

Plaintiff's Exhibit 4 is the controlling purchase and sale agreement for the property in question. It is signed by the parties and was prepared for the express purpose of obtaining bank financing. The agreement called for a cash purchase price of the subject property of $609,500 on which the bank relied in granting a mortgage of $457,125 or 75% of value, as was its policy. An alleged $60,000 deposit and cash to be

paid by Lewis made up the balance of the purchase price. However, in fact, there was no deposit or any intention for Lewis to pay any balance. Of the $457,125, less $6,478.66 in legal and recording fees, Burgess paid $263,866.17 for the property he simultaneously sold to Lewis and pocketed $186,779.17. At this point, Burgess, for no investment, had made a profit of $186,779.17 and Lewis had a parcel on which 27 condominiums could be built at what he considered a land cost of approximately $17,000 a lot all totally financed by the bank. The bank was also committed to a construction mortgage. Neither had any of their own money involved. The only purchase and sale agreement given to the bank made no mention, nor is there any indication that the bank was aware of the separate deal between Lewis and Burgess that appears in the other two purchase and sale agreements. The two other purchase and sale agreements, in somewhat ambiguous terms, Defendants Exhibits A and B, appear to complete the scheme. Neither of them were known to the bank and both of them provide that Burgess would get a right to buy at least 14 of the condominiums for $64,650 each which, at the time, was the amount necessary to get a partial release of the bank's mortgage and was alleged to be the estimated cost of a unit. Since the units were selling for an average of $100,000 plus, this arrangement should have been mutually advantageous but Lewis was either too trusting or stupid, or both, and Burgess was too greedy. Together, they killed the goose that was laying the golden eggs. Reduced to its simplest terms, Burgess, instead of purchasing alternate units and contrary to their understanding or even the logic of the financial necessities for financing the project, made sure he not only got his 14 units first, thereby assuring that he would get his benefit first he also he took all of the additional deposits and other assets, while Lewis, who diverted some of the construction money for personal expenses, could not complete the project with what was left of the construction money and the inadequate amounts he was able to badger from

Burgess and obtain from some of the final sales.

■ By use of a variety and imaginative legal theories, Lewis seeks to do today many of the things he should have done yesterday to prevent Burgess' over reaching. Possibly the most creative was the filing of an involuntary proceeding for an imaginary partnership between himself and Burgess for which he even chooses a name, Leedham Farm Condominium Trust. The intent was to allow him to recover from Burgess on theories of breach of fiduciary obligations. The approach certainly has a basic appeal in that it would be the simplest way to provide, after the fact, equity. There was no partnership in fact or in either party's contemplation although they certainly muddied the waters with a number of ambiguous incidents. There was no legal obligation to share losses or even any specific profits. There were no joint bank accounts or any joint bookkeeping. There was no sharing of the profit on the land purchase. Title was just in Lewis' name and Burgess actually from the start was only concerned with himself. To the extent any third party may have been mislead, nothing in this opinion prevents any suit by that party in an appropriate court against Burgess, but an involuntary petition cannot be filed on the basis of a partnership by estoppel which is really the essence of Lewis' argument. *In re Kuntz,* 33 F.2d 198 (M.D.Pa.1929); *In re Ganaposki,* 27 F.Supp. 41 (M.D.Pa.1939); *In re Verses I,* 15 B.R. 48, 51 (Bankr.W.D.Pa.1981). Counsel get A for ingenuity but, clearly, there was no partnership, real, or by estoppel, or such a joint venture, as would warrant this involuntary petition, and Burgess' motion to dismiss must be allowed.

Lewis' claims against Burgess are for the wrongfully withheld deposits, the receipts for alternate sale proceeds, and the obtaining of title to some of the units by fraud. Other claims are based on preference or fraudulent conveyance. These later two theories are also the basis of the attempts to invalidate the judicial lien of Gaston Snow, one of his former attorneys,

and McDonald's mortgage by another former attorney.

The threshold issue on preference and fraudulent conveyance then is, was Lewis insolvent at the time of these challenged transactions or did he become insolvent as a result of such transfer or obligations or intend to incur, or believed that he would incur debts that would be beyond his ability to pay them as they matured.

To determine that issue as well as understand why this is one of those cases that goes beyond feeding an economic pig and calls for the curbing, if not the slaughtering, of a hog, an analysis of the sometimes convoluted facts is necessary. However, in order of the legal issues, the facts at this juncture will primarily be limited to the issue of insolvency.

The debtor seeks to establish that he was insolvent as of October 1, 1987 and then by projecting the results forward to May 18, 1988, the date of filing, establish insolvency for the entire period, all in contradiction of the schedules, which would appear to indicate solvency. During this period, October 1, 1987 through May 18, 1988, the debtor seeks to avoid various transactions as preferences and fraudulent conveyances.

The debtor has submitted an unverified balance sheet prepared by his accountant for the purposes of this proceeding reflecting his net worth as of October 1, 1987. The balance sheet claims the debtor had a negative net worth of $123,378 based on the debtor losing $209,978 in building the Leedham Farm project. Little weight can be given this statement. The balance sheet as of October 1, 1987 was prepared without any reference to documentation or verification by the accountant and were based solely on what he was told by Lewis, a less than reliable source. Omitted assets include the house, worth $150,000,[1] and one condominium from the valuation of the Leedham Farm Project, thereby adding at least $250,000 to the debtor's net worth. This one adjustment establishes that the

debtor had a positive net worth of $76,622 as of October 1, 1987. Listed as liabilities are $451,000 of accounts payable on the Leedham Farm Project. Lewis did not even own the land until October 15, 1987. Some $63,000 are alleged debts due his sons but there are no payroll records, notes, or documentation to support them.

Mr. Lewis, both at the trial and in his bankruptcy schedules, alleged that he owes his son, Ken Lewis, $18,000, and his son, William H. Lewis, Jr., $60,900, and his sister-in-law, Jean Duggan, $14,000. The best evidence Mr. Lewis was able to present of any of these debts was a series of checks written by William H. Lewis, Jr. to creditors of the debtor. There was no indication that the checks were issued to pay off the father's and not the son's debts. The debtor explained that he had lost contact with his son, William H. Lewis, Jr., and so could not produce any evidence of his debt, one day, and the next day, the debtor came in bearing the checks in question, claiming he discovered them laying about his son's room. The Court does not find this explanation of the appearance of the checks credible, let alone satisfy the strict scrutiny test an insider claimant must pass once his claim is challenged. *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *In re Beverages Intern, Ltd.*, 50 B.R. 273, 280–81 (Bankr.D.Mass. 1985); *In re Teletronics Services, Inc.*, 29 B.R. 139 (Bankr.E.D.N.Y.1983); *In re Inter–Island Vessel Company*, Bankr. Case No. 85–758–HL, slip opinion, (Bankr.D.Mass. June 6, 1988). As previously explained, the debtor's mere assertions that his sons are entitled to money because they performed work on Leedham Farms and his sister-in-law loaned him $14,000 cash is insufficient to establish the validity of the insider claims, which are unsupported by any payroll or other records, and even the explanation of the

---

1. The debtor has valued the house, now converted to two housing units, to be worth $150,000 in his schedules. Later, in his complaint, he alleges the house is worth $200,000. The Court finds the $150,000 value to be more realistic because

each of the two units is smaller than the other condominiums. The account explains his computation of the loss in Leedham Farm based on his analysis on 26 units, in fact, there are 27, and the house.

debtor of the work allegedly done did not add up to the amounts claimed.

The debtor's solvency becomes far clearer if we look at the schedules filed by the debtor. On the date the debtor filed for bankruptcy, May 17, 1988, he claimed to be worth $35,193.87. The Court, after reviewing the schedule of assets and debts, in light of evidence presented during the trial, and bankruptcy law, finds the debtor's net worth should be increased by $371,200 for a total net worth of $406,393.87.

Even if the Court were to find that the claims asserted by Mr. Lewis against Mr. Burgess in the bankruptcy schedules for the recovery of assets has no merit, Mr. Lewis would still have positive net worth of $138,893.87.

The increase in the debtor's net worth as of May 18, 1988 results from the debtor omitting assets and inventing indebtedness. At the trial, Mr. Lewis admitted to not listing $101,300 in assets that should have been added to his net worth as of May 18, 1988.[2]

█ The parties have discussed whether the debtor's Sharon property, which is held in a statutory tenancy by the entirety is exempt. 11 U.S.C. § 522(b)(2)(B). Exempt assets are not included when a balance sheet determination is made whether the debtor is solvent or insolvent, 11 U.S.C. § 101(31)(A)(ii). The Massachusetts Supreme Judicial Court has thrown the status of a tenancy by the entirety into limbo by subjecting a tenancy by the entirety to judicial attachment but not to levy or execution. *Peebles v. Minnis*, 402 Mass. 282, 521 N.E.2d 1372 (1988). It is not clear if an asset being subject only to an attachment is subject to process and thereby no longer exempt. There is no need for the Court to decide this issue at this time because the debtor is clearly solvent even if the Sharon house is exempt. Assuming, however, that the Sharon property is found to be exempt and, therefore, not included among Lewis'

assets, the Court would have to increase the net worth of the debtor by $177,000. The debtor, on his schedules, sought to exempt the full value of the Sharon house while listing the $177,000 mortgage on the house as a debt. A debtor can only exempt the equity he has in an exempt piece of property. *In re Coleman*, 21 B.R. 832 (Bankr.S.D. Texas 1982). Therefore, the $177,000 mortgage cannot be considered a debt of the estate and, of course, increases the debtor's equity.

█ The counts in the Lewis complaints seeking recovery from Burgess or to set aside the Gaston Snow attachment and invalidate the Burgess and McDonald mortgages based on preference or fraudulent conveyance must be found for the various defendants since Lewis has been unable to prove during the relevant period, October 15, 1987 to May 18, 1988, that Lewis was in fact insolvent, was made insolvent or intended to incur or believed that he would incur debt beyond his ability to pay.

Solvency, having been established, there is no basis to void the Gaston Snow attachment, the value of which awaits the resolution of the value of their unpaid legal services.

█ Likewise, McDonald's mortgage of $14,000 remains valid subject to determining the amount due for legal services. $10,000 was the agreed price for the legal work necessary for each phase of the condominiums and the individual passings. The second phase was satisfactorily completed and McDonald was paid $6,000, leaving a balance due of $4,000. The third phase was not completed in that McDonald refused, after the filing of Chapter 11, to complete the last seven passings at what he estimated as worth $350—$500 per passing. Using an average of $425 per passing, Attorney McDonald did not handle seven passings, or a total of $2,975, must be deducted, leaving a legal fee of $11,025 secured by the McDonald mortgage. Mr.

---

**2.** Assets omitted from the bankruptcy schedule are: (1) life insurance—worth $4,000; (2) his share of the equity of a two-family house in Stoughton—worth $68,400; (3) Florida timeshare equity—worth $2,000; (4) an IRA—worth $4,000; (5) contested account receivable discounted 50%—$7,500; and, (6) various pieces of equipment—worth $15,400. The Court is using, without accepting, the debtor's values.

McDonald's counsel has presented an interim bill for legal fees for the necessary legal work in collecting on the note and mortgage. The Court, ordinarily, would allow the assessment of attorney's fees where the note so provides. However, in this proceeding, counsel's efforts were primarily concerned with McDonald's breach of his agreement to complete phase 3 and his failure to promptly turn over the condominium documents and engineering material to counsel for the debtor-in-possession. This not only caused McDonald unnecessary legal effort, it forced the debtor-in-possession to incur what should have been unnecessary legal expense. As to the challenge to his mortgage, the task was at most monitoring Burgess' successful trial of the solvency issue which carried the McDonald mortgage piggy back. Thus, the necessary legal services to protect McDonald's position were very limited and more than offset by the cost to the debtor incurred in the turnover. Each party will bear their own legal expenses and no additional award will be made to McDonald.

The ingenuity of counsel for Lewis in presenting this arsenal of legal theories was not only a further muddying of already turbulent waters, it may in fact have been unnecessary. The unobjected to evidence presented would have allowed Lewis to pursue simple breach of contract claims to accomplish most of the relief Lewis might be entitled to against Burgess or McDonald and a fraud claim would have provided a basis for additional recovery from Burgess. Typical of this case, nobody seems to believe that a straight line is the shortest route between two points. To the extent that the proof exceeds the complaints, Lewis is given 20 days to amend his pleadings to conform to the evidence. *Downey v. Palmer*, 114 F.2d 116 (2d Cir. 1940); *Padgett v. Padgett*, 88 F.Supp. 630 (S.D.Fla.1950); 35A C.J.S. Federal Procedure § 334 (1988).

The transactions between Burgess and Lewis can be divided into three categories: (1) division of condominiums between Burgess and Lewis; (2) diversion of deposits and proceeds by Burgess; and, (3) diversion of interests in real estate by Burgess.

Burgess, by agreement with Lewis, was entitled to 14 condominium units at the price of $64,650. Pre-petition, the debtor sold 18 units, 11 of which Burgess was entitled to after paying $64,650. Any profit or loss on these units would be Burgess' and, in fact, they were all sold in excess of $100,000. The debtor has sold five more units, post-petition.

■ Burgess' rights under the purchase and sale agreement to the three units, or any additional units, have to be defined. The parties have extensively briefed the issue of whether Burgess is entitled to a lien under 11 U.S.C. § 365(j). Before this issue can be reached, the Court must consider whether the purchase and sale agreement between Burgess and Lewis is an executory contract governed by 11 U.S.C. § 365(j).

The Bankruptcy Code does not, but the federal case law does define the term, executory contract. *In re McDaniel*, 89 B.R. 861 (Bankr.E.D.Wash.1988). An executory contract is one "which the obligations of both parties are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Rehbein*, 60 B.R. 436 (9th Cir.B.A.P. 1986), *citing* Countryman, *Executory Contracts in Bankruptcy, Part 1*, 57 Minn.L. Rev. 439, 460 (1973); *In re Pacific Exp., Inc.*, 780 F.2d 1482 (9th Cir.1986).

We must then look to state law to determine whether the failure of one party to perform excuses the performance of the other. *In re McDaniel, supra.* Judge Tauro has recently considered whether a breach of a purchase and sale agreement would excuse performance in Massachusetts. He found that in most circumstances, it does not.

*See also Rigs v. Sokol*, 318 Mass. 337, 61 N.E.2d 538 (1945) ("It may be taken to be settled in this Commonwealth that the question whether a contract will or will not be specifically enforced depends upon the question whether the thing contracted for can be purchased by the plaintiff, and whether damages are an adequate

compensation for a breach."); *Friend Bros., Inc. v. Seaboard Surety Co.*, 316 Mass. 639, 645, 56 N.E.2d 6 (1944) (same). Moreover, money damages are usually an inadequate remedy where, as here, the contract is for a sale of real estate. As the Supreme Judicial Court has noted, "Every piece of real estate has some unique disadvantage as well as advantage. The eagerness of buyers to acquire some properties is matched by the joy with which sellers part with others." *Olszewski v. Sardynski,* 316 Mass. 715, 717, 56 N.E.2d 607 (1944). Consequently, "in the absence of significant equitable reasons for refusing such relief, specific performance of real estate agreements is appropriate." *Raynor v. Russell,* 353 Mass. 366, 367–68, 231 N.E.2d 563 (1967). Indeed, "specific performance ... is usually granted with respect to contracts to convey land." *Kaplan v. Bessette,* 357 Mass. 233, 235, 257 N.E.2d 926 (1970) (citing *Raynor v. Russell, supra*).

*Roxse Homes, Inc. v. Roxse Homes, Ltd. Partnership,* 83 B.R. 185, at 188–189 (D.Mass.1988).

A debtor filing for bankruptcy cannot escape his responsibility to specifically perform. A duty to specifically perform cannot be reduced to a monetary claim because of the uniqueness of real estate and, therefore, cannot be discharged. *In re Roxse Homes,* 74 B.R. 810, at 818–819 (Bankr.D.Mass.1987) *aff'd,* 83 B.R. 185 (D.Mass.1988). Thus, since Lewis cannot escape his duty to perform, a purchase and sale agreement of real estate is not an executory contract that can be rejected under Section 365. To the extent that 14 units have not been conveyed to him, Burgess, on payment of $64,650 each, is entitled to such additional units.

Burgess, who, to protect his interest was handling the sales, took the first 11 sales as his units. Neither of the two purchase and sale agreements specifies which units are to be sold to Burgess, the only written provisions deal with the number and the price of units, namely, 14 units at $64,650 each. Burgess, himself, concedes his uncertainty as to which units should be his

when he seeks to justify taking the deposits for more than 14 units on the ground that Lewis was undecided as to which units would go to Burgess. Lewis testified that he and Burgess understood the agreement to be that each would take alternate units and the alternating understanding that squares with both reasonableness and the economics of necessity of a cash flow to pay for the continuing construction costs not covered by the construction mortgage.

Despite the cash flow problem that Burgess may have created by taking the first 11 units, the bottom line comes out the same since there have been 23 units sold and, except for the deposits Lewis received, the proceeds from the sale of the other 12. As to the 11 units, Lewis received the agreed $64,650 for each and has no additional claim as to those. Burgess, however, also received the deposits on the 12 additional units, totaling $122,550, all of which belongs to Lewis.

Unit 3–2 was to be Burgess' twelfth unit, but the third-party buyer reneged and since Burgess intended, as he did in the 11 other purchases, to use the third-party purchase money to pay Lewis the $64,650, the transaction was not consummated and the forfeited deposit belongs to Lewis who remained, at that time, the owner of unit 3–2.

The final series of tangled transactions involved a house on the property when Burgess sold the land to Lewis and condominium unit 2–2. Mr. Lewis, on October 16, signed a deed giving the house to Burgess' mother, Anne Burgess, for $10. Burgess alleges he never intended to convey the house to Lewis but could not divide the parcel prior to the conveyance to Lewis, but it was understood that Lewis would convey the house back to him. Lewis testified that there was no such agreement and that he had no intention of conveying the house back to Burgess. Lewis testified that Burgess tricked him by slipping the deed in amongst other papers that he was signing and that he never would have signed the deed if he were aware of it.

This Court normally follows the rule that a party signing a document is presumed to

have done so knowingly, *Markell v. Sidney B. Pfeifer Foundation,* 9 Mass.App. 412, 402 N.E.2d 76, 93 (1980). However, the facts in this case do not support this conclusion. Lewis, after October 16, rehabilitated the house, converting it into two condominium units. Lewis would not have done so if he had thought the property was not his. Burgess did not even allege that Lewis agreed, in addition to giving up the house for a pittance to rehabilitate it for free. Even more significantly, Burgess did not record his deed until January, three months after the deed was signed in October. Finally, Burgess is a sophisticated real estate developer who certainly knew how to protect himself in the original purchase and sale agreement if the house was not to be included. The Court finds that Burgess fraudulently obtained the house.

The master condominium deed describes the house as having two condominium units and Burgess testified that his mother resides in one unit and that the other is rental. Since Burgess was so anxious to take these units from Lewis by fraud, he cannot complain if the Court now, rather than invoking its powers under 11 U.S.C. § 105, and Bankruptcy Rule 7070, and Federal Rule of Civil Procedure 70, to have this house reconveyed to Lewis, allows Burgess to keep it as his 12th and 13th units and requires him to pay Lewis the agreed $129,300.

Mr. Lewis testified that he signed over unit 2–2 to April Realty Trust, admittedly an alter ego of John Burgess, on April 16, 1988 at Burgess' urging to avoid impending attachments. Lewis claims that Burgess called him on Friday, April 15, 1988 and told him to come to his house the next morning. Lewis went to Burgess' house and was told by Burgess that Gaston Snow may attach unit 2–2 to secure unpaid legal bills. Burgess told Lewis that the way to protect unit 2–2 was to convey it to April Realty Trust, which Burgess has admitted is his proxy. Burgess had a deed and a notary, a friend of Burgess, all ready for an immediate conveyance of the land. Lewis agreed and signed the deed which recited that Lewis received $75,000 for the unit. Both Burgess and Lewis have testi-

fied that the $75,000 was never paid. In essence, Lewis claims to have transferred unit 2–2 to defraud creditors. No consideration was paid and there was no intention to transfer actual ownership to this unit to Burgess. Burgess claims to have paid for the unit by surrendering his contract to purchase three condominium units or, in the alternative, by waiving the $96,000 owed for the purchase of the land. (The Court, earlier in this opinion, found that nothing was due from Lewis to Burgess on the sale of the land.) While it is desirable for lawyers to provide alternate explanations of how an event happened, it is undesirable for a witness because it destroys his credibility. A witness either knows what happened or he does not. In any case, the Court does not believe these explanations and finds that Mr. Burgess fraudulently obtained unit 2–2 from Lewis for the purpose of defrauding Lewis' creditors.

■ Burgess recorded the deed to unit 2–2 on April 27, 1988 at 3:59 P.M. At the same time, Burgess recorded a mortgage of $11,852.00 which Lewis granted Burgess on April 25. Burgess claims that the mortgage is for unspecified loans and to insure that he received payment for appliances he sold to Lewis for the development. Burgess has not alleged that any specific amounts are owing. He has not provided the Court with any documents or testimony that would allow the Court to find any amounts owing. Any presumptions that Burgess may have had have long been lost in the hog wallow of both parties' relationship. Lewis alleged that the mortgage was, like the deed to unit 2–2, to protect the property from creditors. The Court finds both unit 2–2 and mortgage were never intended to be real transfers or liens and that no consideration was exchanged for either. The mortgage is void as a deliberate and willful attempt to hinder, delay and defraud creditors under 11 U.S. C. § 548(a). As to unit 2–2, again, instead of ordering it reconveyed, it will be treated as the 14th unit, and Burgess is ordered to pay the contract price of $64,650.

Thus, Burgess, in fact, received all 14 units pre-filing by the delivery of 14 condo-

minium units as chosen by Burgess and conveyed to his admitted proxies, Anne Burgess, April Realty Trust, and Chrysalis, Inc.

Lewis, in his brief, seeks to keep out all testimony of Burgess of payment since, as an affirmative defense, it must be so pleaded. Lewis cites Federal Rules of Civil Procedure 15(b), made applicable in bankruptcy by Bankruptcy Rule 7015. While true, the objection is waived when no objection is taken at the trial. *Agricultural Services Assoc., Inc. v. Ferry–Morse Seed Co., Inc.,* 551 F.2d 1057 (6th Cir.1977); *Lopez v. U.S. Fidelity Guarantee Co.,* 18 F.R.D. 59 (D. Alaska 1955); *McCormick on evidence,* p. 126 (3rd edition 1984). Further, it hardly is in Lewis' mouth to object to Burgess offering evidence that, as a result of pre-trial discovery, comes as no surprise when Lewis, himself, will need to amend his pleadings to conform to the evidence. *Downey v. Palmer,* 114 F.2d 116 (2d Cir.1940); *Padgett v. Padgett,* 88 F.Supp. 630 (S.D.Fla. 1950); 35A C.J.S. Federal Procedure § 334 (1988).

Burgess has presented into evidence as offsets $65,350 worth of checks that he has written to Lewis, pre-petition. Both Lewis and Burgess, amazingly, agree that $48,500 represents the return of deposits. $5,000 represents the defaulted deposit addressed earlier. The status of one check for $11,850 is disputed. Burgess claims it is a loan. Lewis claims it is the return of deposits that he made, through Burgess, for the purchase of land. The Court finds Lewis more credible for several reasons. First, Lewis had paid Burgess $14,300, pre-petition, which represented the payment of the land deposits. Second, Burgess, at this point, owed Lewis close to $70,000. It is not logical to cast as a loan by Burgess money that he clearly owed Lewis. Third, Lewis' testimony to the $48,500 worth of offsets only questions the one check. The Court finds that Lewis is credible and that the $11,850 was the return of money advanced to Burgess as a deposit on a land purchase that could not be consummated. Burgess will be allowed an offset of $48,500.

Burgess owes Lewis for deposits he wrongfully withheld from Lewis in the amount of $122,550, and $193,950 for the three units in the house and unit 2–2.

Burgess is entitled to a credit of $48,500 which Burgess repaid to Lewis as a result of Lewis' efforts to compel Burgess to return the deposits, and Lewis, on receipt of payment from Burgess, must pay the bank a sufficient sum to obtain partial releases of the mortgage on the house, and unit 2–2 which Burgess on payment has a right to receive as his purchase of each unit was to be free of the bank's lien. The attachment of Gaston Show is valid to the extent of a determination of the amount due for legal services, and the mortgage of McDonald is valid in the amount of $11,025. The Burgess mortgage is null and void.

Counsel for plaintiff is to submit within 20 days a proposed order consistent with this Memorandum and Local Bankruptcy Rule 41(D).