Joseph BUTLER and Lateran Partners,
Inc., Appellants,

v.

RESIDENT CARE INNOVATION
CORP., Appellee.

No. C.A. 99–14L.

United States District Court,
D. Rhode Island.

Nov. 17, 1999.

Linda R. Sloan, Salter, McGowan, Swartz & Sylvia, Providence, RI, Edward J. Fallman, Joseph G. Butler, Barron & Stadfeld, Boston, MA, James F. Wallack, Goulston & Storrs, P.C., Boston, MA, for appellants.

Victor G. Milicone, Peabody & Brown, Boston, MA, Arnold N. Montaquila, Providence, RI, Peter J. Furness, Peabody & Brown, Providence, RI, for appellee.

Sheryl Serreze, Providence, RI, U.S. Trustee.

### DECISION AND ORDER

LAGUEUX, Chief Judge.

The matter before this Court is an appeal from a final order of the United States Bankruptcy Court for the District of Rhode Island (the "Bankruptcy Court"). This appeal involves a dispute that arose during reorganization proceedings under chapter 11 of 11 U.S.C. § 101, et seq. (The "Bankruptcy Code"). Pursuant to 365 of the Bankruptcy Code, a debtor-in-possession, or a debtor's trustee as is the case here, is allowed to reject or assume any executory contract entered into by the debtor. The dispute between the parties here is whether or not certain Vermont real estate purchase and sale agreements were executory contracts that could be rejected by the Trustee under § 365 of the Bankruptcy Code.

The Bankruptcy Court heard the matter and concluded that three unconsummated real estate purchase and sale agreements between the debtor, Quechee Lakes Corporation ("QLC"), and the non-debtor party, Resident Care Innovation Corporation ("RCI"), were not executory contracts under § 365. As a result, he entered an order denying the Trustee's motion to reject the agreements. The Bankruptcy Judge also concluded that RCI was entitled to specific performance of the agreements.

For the reasons outlined below this Court reverses the decision of the Bankruptcy Court and concludes that the Trustee's motion to reject the purchase and sale agreements must be granted.

### I. *Background*

This case is largely abut the aesthetic future of a small New England town. The force driving this case is the fact that the opposing parties harbor wholly inconsistent plans for the future of the real estate at issue in this case. QLC is a Delaware corporation and is a wholly-owned subsidiary of NECO Enterprises, Inc. ("NECO"). The assets of QLC include a slew of undeveloped lots of land located in the Quechee Lakes region of Hartford, Vermont. *See* Appellants' memo., p. 5. On or about March 6, 1997, Appellee, RCI, made an offer to purchase the three lots in controversy, which are located in the Village Green, for $30,000 each. *See* First RCI memo., p. 1. RCI made a deposit of $500 on each lot at the time of the offer. *Id.* On or about March 10, 1997, QLC entered into three separate contracts for the sale of the lots. *Id.* RCI also made an additional deposit of $2500 for each lot on or about March 17, 1997. *Id.* at 2. Each of the purchase and sale agreements provided that the closings were to take place on June 6, 1997, unless otherwise agreed upon in writing. *Id.* The agreements required that QLC provide RCI with Vermont Warranty Deeds conveying marketable title to the lots. *Id.* They also required that if QLC discovered title defects and/or encumbrances on the lots, QLC would remove such defects or encumbrances in order to convey marketable title. *See* RCI Proof of Claim, para. 6 of Exhibits 1 through 3. RCI is a developer of assisted living facilities. *See* Rejection Hearing Transcript, p. 51. If successful in this case, RCI planned to build large scale housing units that will be used as assisted living facilities on the three lots in the town center. *See* Exhibit A.

On or about July 28, 1997, RCI and QLC executed an addendum to each agreement extending the closing date to August 20, 1997, in order to give QLC more time to review the status of the title to the lots. *See* First RCI memo., p. 2. As of late July, 1997, there remained multiple liens and/or encumbrances on the lots. *Id.;* Appellants' memo., p. 9. There appears to have been some fifteen liens on

the lots still outstanding in July of 1997. Despite the efforts of QLC's real estate attorney to obtain releases from the lien-holders, in late August, 1997, releases still had not been obtained from four of the lien-holders. *See* Appellants' memo. at 9; Motion for Reconsideration, p. 6. On August 21, 1997, RCI wrote a letter to QLC's attorney, discussing two of the liens on the lots, and enclosed a *photocopy* of a cashier's check in the amount of $81,000 which would cover the remaining purchase price for the lots. *See* RCI Proof of Claim, Exhibit 4. Obviously, said check was not cashed.

In late August, 1997, RCI intervened in a lawsuit between QLC and one of its lien-holders, the Rhode Island Depositors Economic Protection Corporation ("DEPCO") that was pending in Windsor County Superior Court in Vermont. *See* First RCI memo., p. 3. On December 26, 1997, an order was issued by that Court allowing the sale of the lots to RCI pursuant to the agreements free of DEPCO's lien. *Id.* This order did not address any of the other liens on the lots still outstanding. *See* Motion for Reconsideration, p. 6. Additionally, this order was not for specific performance of the agreements because RCI did not seek such relief when it intervened in the suit. *See* Appellee's memo., p. 8. QLC did not transfer title to the lots because of the bankruptcy proceedings involving its parent company NECO. *See* Rejection Hearing Transcript, p. 53.

On December 23, 1997, an involuntary bankruptcy case was commenced against NECO in the Bankruptcy Court for the District of Rhode Island. On February 13, 1998, that Court entered an order for relief against NECO under Chapter 11 and authorized Joseph G. Butler to be the permanent Chapter 11 Trustee of NECO. On February 3, 1998, QLC had voluntarily filed for bankruptcy under Chapter 11 in the Bankruptcy Court for the District of Vermont. On April 14, 1998, QLC's bankruptcy case was transferred to the Bankruptcy Court for the District of Rhode Island. On May 1, 1998, the Bankruptcy Court here ordered that the bankruptcy cases of NECO and QLC (collectively, the "Debtors") be jointly administered. *See* Appellants' memo., p. 6.

The Trustee and Lateran Partners, Inc. ("Lateran") filed the First Amended Plan of Reorganization for All Debtors Proposed by Joseph G. Butler, Trustee of NECO Enterprises, Quechee Service Co., Rock Realty, Inc., Quechee Water Company, QLC and Lateran Partners, Inc. dated August 24, 1998 (the "Joint Plan"). The Joint Plan for NECO and all of its subsidiaries, provided the Trustee with a plan funding payment by Lateran in the amount of $2,820,000 which would be used by the Trustee to pay claims against the Debtors. *See* Joint Plan, Art. V, pp. 40–48 and Art. I, p. 10. In exchange for this funding, Lateran would receive all of the real estate and assets of NECO as well as NECO's subsidiaries, which included QLC. The plan of reorganization funded by Lateran specifically called for Lateran's acquisition of the lots at issue in this matter. *See* Joint Plan, Art. V, §§ 5.2, 5.3, p. 41.

Under the Joint Plan, in addition to the three lots at issue here, Lateran acquired a large amount of land from QLC, which it planned to develop into a vacation resort area. *See* Disclosure Statement, p. 7. With respect to the three lots at issue, Lateran stated that it intended to turn one of the lots over to the town of Hartford. *See* Appellants' memo., p. 24. Lateran planned to develop the other two lots in a manner consistent with the vacation resort plans intended for the additional real estate that Lateran acquired under the Joint Plan. *Id.* It is obviously clear that Lateran's plan for a vacation resort in Hartford would be greatly disrupted by RCI's plan to develop large apartment type buildings in the town center.

As of February 3, 1998, the date on which QLC filed its petition for relief under Chapter 11 of the Bankruptcy Code, the sale of the lots had not been consummated, and the agreements remained un-

performed. *See* First RCI memo., p. 3. QLC had yet to deliver a Warranty Deed to RCI free and clear of the outstanding multiple liens, and there had been no payment by RCI of the remaining purchase price for the lots. *Id.*

## II. *Decision of the Bankruptcy Court*

The Trustee, in his capacity as sole shareholder of QLC, sought to reject the purchase and sale agreements between QLC and RCI as executory contracts under § 365 of the Bankruptcy Code. *See* Trustee's Rejection Motion, Bankruptcy Court Case No. 98–11741, Document No. 71–1. The Trustee argued that the agreements were executory because they had not been performed, and that performance of the agreements would not be beneficial to the Debtors' estate. *See* Trustee's Rejection Motion, p. 2. In response, RCI asserted that the contracts were not executory because RCI had performed all of its obligations thereunder. *See* First RCI memo., pp. 4–7. RCI also asserted that QLC was deceptive in its dealings with RCI, and that rejection of the agreements would not benefit the Debtors' estate. *Id.* at 4, 8–9.

On September 28, 1998, at the hearing, the Bankruptcy Court denied the Trustee's Rejection Motion. The Bankruptcy Judge made an implicit factual finding that the decision to reject the agreements was properly within the business judgment of the Trustee, since he stated that the only issue in the case was whether or not the agreements were executory. *See* Rejection Hearing Transcript, pp. 59–60. The Bankruptcy Court then held that the agreements were not executory and that equitable principles weighed in favor of granting RCI specific performance. *See* *Id.* at 65–66. The Trustee filed a motion for reconsideration of the Bankruptcy Court's determination with respect to the agreements and RCI filed an objection to that motion. On November 9, 1998, the Bankruptcy Court denied the Trustee's motion for reconsideration. After the

Bankruptcy Court's denial of that motion, the Trustee and Lateran (collectively, "Appellants") filed this appeal from the Bankruptcy Court's final order on November 19, 1998.

In this appeal, the Appellants argue that the agreements were executory on QLC's petition filing date and, therefore, capable of rejection because there were mutual unperformed obligations under those agreements, and because rejection would be beneficial to the Debtors' estate. The Appellee argues that the agreements were not executory contracts, that equity requires specific performance of the agreements, and that rejection of the agreements would not benefit the estate.

## III. *Jurisdiction and Standard of Review*

This Court has jurisdiction to hear an appeal from a final order of a bankruptcy court pursuant to 28 U.S.C. § 158(a). On appeal from a decision of the Bankruptcy Court, this Court sits as an intermediate appellate court. Such appeals are "taken in the same manner as appeals in civil proceedings generally are taken to the court of appeals from the district courts." *Id.* § 158(c)(2); *see also In re Mayhew*, 223 B.R. 849, 854 (D.R.I.1998). Under Bankruptcy Rule 8013, this Court "may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings." Fed.R.Bankr.P. 8013 (West 1984). Finally, this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a) and (c).

The factual findings of a bankruptcy court may only be set aside if they are "clearly erroneous." Fed.R.Bankr.P. 8013 (West 1984); *In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir.1992); *In re Lopes*, 211 B.R. 443, 445 (D.R.I.1997); *In re Giordano*, 188 B.R. 84, 86 (D.R.I.1995); *In re Anderson*, 128 B.R. 850, 852 (D.R.I.1991). "A finding is 'clearly erroneous' when . . .

the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In re Roco Corp.*, 64 B.R. 499, 500 (D.R.I. 1986) (citing *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

The legal conclusions of a bankruptcy court, however, are reviewed de novo and no special deference is owed to the decision below. *See In re LaRoche*, 969 F.2d at 1301; *In re Lopes*, 211 B.R. at 445; *In re DiMartino*, 108 B.R. 394, 399 (D.R.I.1989). Where a question of law is at issue, this Court is required "to make a judgment independent of the [B]ankruptcy [C]ourt's, without deference to that court's analysis and conclusions." *In re Nobelman*, 129 B.R. 98, 99 (N.D.Tex.1991) (cited with approval in *In re Guilbert*, 176 B.R. 302, 305 (D.R.I.1995)). In short, the legal conclusions of a bankruptcy judge are subject to plenary review. *In re Guilbert*, 176 B.R. at 305. Furthermore, this Court is not bound to remain within the confines of the Bankruptcy Court's reasoning for its decision, but is free to affirm the decision below on any ground supported by the record. *See In re Erin Food Serv., Inc.*, 980 F.2d 792, 801 (1st Cir.1992); *In re Hemingway Transport, Inc.*, 954 F.2d 1, 9 (1st Cir.1992).

### IV. *Applicable Law*

The precise issue presented to this Court is whether the agreements for the sale of the lots in question are executory contracts and, thus, subject to rejection under § 365 of the Bankruptcy Code. Appropriately, analysis begins with that Code section, which provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Unfortunately, the Bankruptcy Code does not provide a precise definition of the term "executory contract." The legislative history of § 365, however, indicates that an executory contract is a contract where performance remains due to

some extent on both sides. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978) and H.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844, 5963, 6303.

Many courts have noted that this broad definition set forth in the legislative history of the section would render most contracts executory since there are usually unperformed obligations on both sides. *See In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir.1989). Consequently, many courts have adopted Professor Vern Countryman's definition of an executory contract as an agreement under which "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Vern Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn.L.Rev. 439, 460 (1973); *Accord Enterprise Energy Corp. v. United States (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 239 (3rd Cir.1995) (applying the Countryman definition in order to determine if the agreement at issue was an executory contract); *Cameron v. Pfaff Plumbing & Heating, Inc.*, 966 F.2d 414, 416 (8th Cir.1992) (same); *In re Terrell*, 892 F.2d 469, 471, n. 2 (6th Cir.1989) (same); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1045 (4th Cir.1985) (same), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *Sundial Asphalt Co, Inc. v. V.P.C. Investors Corp. (In re Sundial Asphalt Co., Inc.)*, 147 B.R. 72, 79 (E.D.N.Y.1992) (same); *In re Fleishman*, 138 B.R. 641, 646 (Bankr.D.Mass.1992) (same).

Countryman's definition of executory contracts is also called the "material breach" test since a pre-petition contract will be identified as executory when both sides are still obligated to render substantial performance. *See In re Columbia Gas Sys.*, 50 F.3d at 239. If, on the other

hand, performance remains due on only one side the contract is not executory, and thus, not subject to rejection under § 365. *Id.* Under the Countryman definition there is necessarily a need to define substantial performance, otherwise a complete definition would be lacking. Unfortunately, the Bankruptcy Code provides no guidance. The drafters of the Bankruptcy Code must not have intended that the term "executory contract" in § 365 be an empty vessel, devoid of meaning under state common law. Although the Courts generally agree that the definition of an executory contract is a matter of federal law, some Circuit Courts have looked to state law to define substantial performance in order to determine the materiality of the breach.

■ The Ninth Circuit was the first to formulate that federal law defines the term executory contract, but that

> "the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law. While the principles of contract law do not differ greatly from one jurisdiction to another, to the extent they do, a bankruptcy court should determine whether one of the parties' failure to perform would give rise to a 'material breach' excusing performance by the other party under the contract law applicable to the contract ..."

*Hall v. Perry (In re Cochise College Park, Inc.),* 703 F.2d 1339, 1348 n. 4 (9th Cir. 1983); *see also In re Streets & Beard Farm Partnership,* 882 F.2d at 235 (holding that federal law determines definition of executory contract but that state law determines whether a material breach of the contract could occur); *In re Terrell,* 892 F.2d at 471–72 (6th Cir.1989) (stating that a court must first look to the contract law of the state applicable to the contract to determine if performance remains due to some extent on both sides); *In re Columbia Gas Sys., Inc.,* 50 F.3d at 239 n. 10 (same). The First Circuit has not yet spoken on this issue. However, because

identifying an executory contract under the Countryman definition requires an analysis of whether there is substantial performance left on both sides, this Court believes that it can be helpful to look to applicable state contract rules for guidance in determining the materiality of the breach. However, this Court is not bound by such state law.

Some Courts have concluded that the Countryman definition is inadequate and thus, have created another test for determining whether a contract can be rejected under § 365. In *Chattanooga Memorial Park v. Still (In re Jolly),* 574 F.2d 349 (6th Cir.1978), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978) (a pre-Code case), it was observed:

> "[The Countryman] definition [is] helpful, but [it] do[es] not resolve th[e] problem. The key, it seems, to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act."

*Id.* at 351; *see also In re Leibinger–Roberts, Inc.,* 105 B.R. 208, 211 (Bankr. E.D.N.Y.1989) (stating that when a debtor cannot reap any benefit from the performance of a contract due to a change in circumstances, the contract is no longer executory and the contract becomes unilateral and enforceable against the parties). This test has come to be known as the "functional analysis" and incorporates the writings of academics who have found reliance on the Countryman definition to be misplaced. *See* Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn.L.Rev. 227 (1989); Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding Rejection,* 59 U.Colo.L.Rev. 845 (1988); Michael T. Andrew, *Executory Contracts Revisited: A*

*Reply to Professor Westbrook*, 62 U.Colo. L.Rev. 1 (1991).

The critical question under the "functional analysis" is whether rejection of the contract would benefit the debtor's estate. *See Cohen v. Drexel Burnham Lambert Group (In re Drexel Burnham)*, 138 B.R. 687 (Bankr.S.D.N.Y.1992) (discussing all of the relevant academic articles at length and concluding that the proper analysis is whether rejection will confer a benefit on the estate). The attractiveness of this approach is obvious since it does not require a court to enter into the "executory contract" thicket. The "functional analysis" is also said to be "faithful to the historical purposes that gave birth to the 'assume or reject' election now codified at 11 U.S.C. § 365, as well as to the present structure of the Bankruptcy Code." *Id.* at 690. Additionally, it allows a bankruptcy court to only "focus on the consequences of assumption or rejection of a contract in terms of the ensuing benefit to the estate and protection of the creditors." *In re Cardinal Industries*, 146 B.R. 720, 728 (Bankr.S.D.Ohio 1992); *see also In re G–N Partners*, 48 B.R. 462, 466 (Bankr.D.Minn. 1985) (noting that the functional analysis does not repudiate the Countryman definition).

Although both tests have been used for determining whether or not a contract may be rejected by the trustee under § 365, this Court is critical of the functional analysis. First, the functional analysis expressly ignores the statutory mandate that the contract be executory under § 365. *See In re Child World, Inc.*, 147 B.R. 847, 851 (Bankr.S.D.N.Y.1992) ("Manifestly, th[e functional] approach ignores the statutory requirement that the contract to be assumed or rejected must be 'executory.'"). Despite its simplified analysis, the functional approach does not necessarily resolve rejection or assumption issues under § 365 any better than the Countryman definition. *See In re Wang Laboratories, Inc.*, 154 B.R. 389, 391 (Bankr.D.Mass. 1993) (adopting the Countryman definition

and stating that the "functional analysis" does not necessarily "get us out of the woods"). While this Court recognizes that there may be some difficulty in determining whether a contract is executory under the Countryman definition, *see, e.g., In re Riodizio, Inc.*, 204 B.R. 417, 422–23 (Bankr.S.D.N.Y.1997) (discussing the limitations of the Countryman definition when dealing with option agreements), the Supreme Court has established the analysis for construing a provision of the Bankruptcy Code that is clear on its face:

> "The task of resolving [a] dispute over ... meaning begins where all such inquiries must begin: with the language of the statute itself. In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"

*U.S. v. Ron Pair Enterprises*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). Section 365 of the Bankruptcy Code clearly requires the contract, if it is to be rejected, to be executory. Therefore, if a Court only examines whether the rejection of the contract will benefit the estate by utilizing the "functional analysis" it must necessarily ignore the clear and unambiguous language in the statute.

Moreover, the "functional analysis" is simply an embodiment of the "business judgment test," which is employed by a bankruptcy court, once the contract in question is found to be executory, to determine whether the trustee's decision to reject the contract benefits the estate, or general unsecured creditors. *See In re Blackstone Potato Chip Co. Inc.*, 109 B.R. 557, 560 (Bankr.D.R.I.1990) (applying the "business judgment test" to the trustee's decision to reject the executory contract).

■ After first finding the contract at issue to be executory, courts confronting the question of rejection, under the prior Bankruptcy Act, consistently held that the decision of the trustee to reject or assume

an executory contract or lease had to be left to his or her business judgment as to what was in the best interest of the estate. *See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 87 L.Ed. 959 (1943); *In re Minges*, 602 F.2d 38, 39, 44 (2d Cir.1979); *Matter of Tilco, Inc.*, 558 F.2d 1369, 1372 (10th Cir.1977). Indeed, the First Circuit Court of Appeals has referred to the decision to reject or assume an executory contract as within the "discretion" of the trustee. *Gulf Petroleum, S.A. v. Collazo*, 316 F.2d 257, 260 (1st Cir.1963). It is to be noted that *Collazo* dealt with the rejection of an agreement for the sale of real estate. Although *Collazo* was decided prior to the enactment of the Bankruptcy Code, Congress has given no indication that the "business judgment test" should not continue to apply under the present Code. *In re A.J. Lane & Co., Inc.*, 107 B.R. 435, 440 (Bankr.D.Mass. 1989) (holding that the "business judgment test" applies to the determination of whether a trustee should be allowed to reject an executory contract for the sale of real estate under § 365). Consequently, in confronting the question of rejection, a court looks to see whether the decision to reject an executory contract is in the best interest of the estate under the "business judgment test," but only after that court has first found that the contract in question is executory. The "functional analysis" overlooks the first step in this statutorily mandated formula.

Although the "business judgment test" is usually applied to the trustee's decision to reject an executory contract, an alternative standard was created for rejection of collective bargaining agreements. Under this standard, the courts require a balancing of the equities between employer and employees, or a showing that the contract was burdensome. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523–526, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *Shopmen's Union No. 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698, 707 (2d Cir.1975). This alternative balancing of the equities

standard has infiltrated court opinions where the issue of rejection under 365 involved contracts other than collective bargaining agreements. For example, in relying on *In re Minges*, a Ninth Circuit bankruptcy appeal panel applied the business judgment test to the debtor's decision to reject a contract for the sale of an apartment house, yet stated that the determination of whether the general unsecured creditors would benefit from rejection was one of "balancing of interests" between damage to the non-debtor party and the damage to the debtor's estate. *Robertson v. Pierce (In re Chi–Feng Huang)*, 23 B.R. 798, 801 (9th Cir. BAP 1982). As a result of cases such as this, other Courts, when applying the "business judgment test," have used language that indicates a balancing of equities approach should be applied to the trustee's decision to reject the contract. *See, e.g., In re Blackstone*, 109 B.R. at 560 (citing *In re Chi–Feng Huang* ).

■ Some courts have recognized that the balancing of equities approach has improperly been applied to cases that do not involve collective bargaining agreements or other vexing property interests. *See In re A.J. Lane*, 107 B.R. at 439–441 (discussing the history of the balancing of equities approach and ultimately rejecting its application to contracts which involve land sale contracts). Despite this unjustified use of the balancing of equities approach in some cases, the weight of authority supports the view that only the business judgment test should be applied when the only question to be decided is whether the general unsecured creditors will benefit from rejection. *See In re Stable Mews Associates*, 41 B.R. 594, 596 (Bankr.S.D.N.Y.1984); *In re A.J. Lane*, 107 B.R. at 440–41. After examining the record, the inquiry ends and rejection is proper if that will benefit the estate and general unsecured creditors. *Id.*

## V. *Application of the Law to the Facts*

■ This Court concludes that the purchase and sale agreements entered into

by RCI and QLC regarding the lots at issue are executory contracts under either the Countryman definition or the functional analysis. However, for the reasons stated earlier this Court favors application of the Countryman definition. Under that widely accepted definition a contract is executory when both parties' obligations thereunder are substantially unperformed, i.e., each party's failure to complete performance would amount to a material breach. *See In re Sundial*, 147 B.R. at 79 (citing Countryman, 57 Minn.L.Rev. at 460). *In re Sundial* is squarely on all fours with the present case. In that case, the Court, applying the Countryman definition, held that the contract entered into for the sale of asphalt plants was executory because "[t]he agreement remain[ed] substantially unperformed. The buyer still has to pay the remainder of the purchase price and the seller has to give up possession and convey title." *Id.* at 80.

In this case, RCI makes the argument that delivery of a photocopy of a cashier's check in the amount of the remaining purchase price constituted a tender. It, thus, argues that the contracts were not executory and subject to rejection because RCI performed its obligation. This argument is totally unfounded since it is clear that RCI failed to tender a check that could be cashed. Therefore, no legal tender was made.

■■■■ Even if this Court looks to applicable state contract law, it is evident that no legal tender was made by RCI. *See In re Streets & Beard Farm Partnership*, 882 F.2d at 235. Not surprisingly, under Vermont law a mere written offer to provide money does not constitute a tender of money. *See Caledonia Sand & Gravel Co., Inc. v. Joseph A. Bass Co.*, 122 Vt. 315, 170 A.2d 627, 628–29 (1961). A readiness to perform, or a naked promise to pay money, does not discharge a party's contractual obligation. *See Noyes et al. v. Pierce*, 97 Vt. 188, 122 A. 896, 898 (1923) (finding that only the actual payment of money and not the promise to pay money

satisfies the party's discharge of obligation under the contract). Furthermore, under Vermont law, a tender, to be effective, must be without conditions. *See Trudeau v. Lussier*, 123 Vt. 358, 189 A.2d 529, 532 (1963).

The agreements clearly required that QLC clear title to the lots and deliver a Warranty Deed to RCI, at which time RCI was required to tender the remaining purchase price for the lots. These obligations remained unperformed as of February 3, 1998, the date on which QLC filed its bankruptcy petition. Under these circumstances, RCI could have secured title to the lots only if it retracted the need for a Warranty Deed and actually placed the remaining purchase price on the closing table in cash, certified check, or a real cashier's check. Consequently, the agreements at issue in this case are executory because the agreements remain substantially unperformed by both parties. *See In re Sundial*, 147 B.R. at 80.

■■■■ RCI's second argument posits that because RCI would be entitled to specific performance of the contracts under Vermont law, the Trustee is precluded from rejecting the contracts. In deciding that the agreements were not executory, the Bankruptcy Court clearly considered equitable principles and the fact that RCI would have been entitled to specific performance under Vermont law had RCI sought such relief. *See* Rejection Hearing Transcript, pp. 65–66. The Bankruptcy Court's consideration of whether a hypothetical Vermont court would have ordered specific performance was inappropriate. Many courts have recognized that where a state court has ordered specific performance prior to the filing of the bankruptcy petition, the contracts are no longer executory because the only performance required by one of the parties is the ministerial act of delivering title. *See, e.g., In re Pribonic*, 70 B.R. 596, 599 (Bankr.W.D.Pa. 1987); *Kendall Grove Joint Venture v. Martinez–Esteve*, 59 B.R. 407, 409–10 (S.D.Fla.1986); *Roxse Homes, Inc. v. Rox-*

se Homes Ltd. Partnership, 83 B.R. 185, 187–88 (D.Mass.1988), aff'd, 860 F.2d 1072 (1st Cir.1988). Such a result is consistent with the Countryman definition since one party's obligation is no longer substantially unperformed after an order for specific performance has been issued. Absent such an order by a state court, a contract is executory if the obligations by both parties remain substantially unperformed. See In re Sundial, 147 B.R. at 81. There was no such order in this case, therefore, the agreements are clearly executory because neither party has performed. RCI had the opportunity to seek an order for specific performance of the agreements outside of QLC's bankruptcy proceeding, but did not do so.

The only case cited by RCI which held that a real estate contract was not executory under § 365 of the Bankruptcy Code is In re Lewis, 94 B.R. 789, 795 (Bankr. D.Mass.1988). That bankruptcy court held that a contract for the sale of real estate is not executory when there is a right to specific performance. Id. The Lewis Court relied heavily upon Roxse Homes, a case that involved a state court judgment ordering specific performance of a real estate purchase and sale agreement. Id. Lewis has since been criticized for this analysis because the Roxse Homes Court regarded the order for specific performance as terminating the executory aspect of the parties' purchase and sale agreement. See In re A.J. Lane, 107 B.R. at 439. The Lewis Court incorrectly equated a pre-petition state court order for specific performance with the inchoate right to attain such an order. See id. That was clearly an erroneous determination, because it is the state court judgment that causes the contract to be no longer executory. See Roxse Homes, 83 B.R. at 187–88. In this case, there has been no state court order for specific performance, therefore, the agreements remain executory.

▮ Finally, RCI contends that rejection of the agreements will not benefit the Debtor's estate and, therefore, fails the "business judgment test," which is applied to the Trustee's decision to reject the contracts. See In re Sundial, 147 B.R. at 84. At the Rejection Hearing, RCI argued that rejection of the agreements would not satisfy the "business judgment test." Thereafter, the Bankruptcy Court made an implicit factual finding that the "business judgment test" was satisfied by agreeing with Appellants, on the record, that the case would be over if the contracts were found to be executory:

> MR. WALLACK: Your honor, if I could briefly respond, as well. First of all, with respect to the Trustee's business judgment, the plan before you—
>
> THE COURT: Is that really an issue here, or is it a question of law whether this is an executory contract?
>
> MR. WALLACK: Well, ... if it's an executory contract, I think the story is over.
>
> THE COURT: Yeah.

Rejection Hearing Transcript, pp. 59–60. Under 28 U.S.C. § 158(a), this Court reviews factual findings of the bankruptcy court under the "clearly erroneous" standard.

▮ "Once a contract is determined to be executory, rejection is proper if it would be advantageous to the debtor's estate." See In re Sundial, 147 B.R. at 83–84 (citing In re Hardie, 100 B.R. 284, 287 (Bankr.E.D.N.C.1989)). In examining the Trustee's decision to reject the executory contracts pursuant to § 365, the reviewing Court ought to defer to the Trustee's decision "that rejection of a contract would be advantageous unless the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim." Id. RCI offered no evidence at the hearing below, and cites to none here, that the Trustee's decision to reject was based on bad faith or was whimsical or capricious.

On the contrary, the record supports the implicit finding made by the Bankruptcy

**48**

Court that the Trustee exercised sound business judgment in rejecting the agreements. If the agreements were performed, the remaining $81,000, payable thereunder, pales in comparison to Lateran's commitment under the terms of the Joint Plan. *See* Joint Plan, Article 1 § 1.9, p. 4 and Art. V, pp. 40–48. Under the Joint Plan, Lateran receives all of the Debtors' assets, which includes "all of [the Debtors'] property, real and personal ... together with the proceeds thereof," *id.* at 4, in exchange for infusing $2,820,000 into the Debtors' estate. *See id.* at 40–48. That is not even a close call. Clearly the Trustee's rejection decision results in a benefit to the Debtors' estate. Consequently, the Bankruptcy Court's implicit factual finding that the Trustee's decision to reject the contracts satisfies the "business judgment test" is affirmed. It would serve no useful purpose to remand the case to the Bankruptcy Court to make an explicit finding.

### VI. *Conclusion*

This Court reverses the Bankruptcy Court's decision that the agreements entered into between RCI and QLC were not executory, and concludes as a matter of law that those agreements were executory and subject to rejection under § 365 of the Bankruptcy Code. This Court affirms the implicit factual finding of the Bankruptcy Court that the Trustee acted properly in exercising his business judgment to reject the executory agreements at issue in this case. For all the foregoing reasons, this Court grants the Trustee's motion to reject the purchase and sale agreements entered into between RCI and QLC. The records of this case shall be remanded to the Bankruptcy Court with this Court's Decision and Order endorsed thereon.

It is so ordered.