**In re RLR CELESTIAL HOMES, INC., Debtor.**

**Bankruptcy No. 89 B 20552.**

United States Bankruptcy Court, S.D. New York.

Dec. 7, 1989.

Barr and Faerber, Spring Valley, N.Y., for debtor.

Rider, Weiner & Melchiori, P.C., Newburgh, N.Y., for Dr. Edgar J. and Evelyn Rojas.

Donna R. Cohen, Office of Donald Tirschwell, New City, N.Y., for Ponce de Leon Savings Bank.

## DECISION ON DEBTOR'S MOTION TO REJECT EXECUTORY CONTRACT

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

The Chapter 11 debtor, RLR Celestial Homes, Inc. ("RLR") has moved for an order pursuant to 11 U.S.C. § 365 rejecting a real estate development contract under which it agreed to build and sell a single family residence for Dr. and Mrs. Edgar Rojas ("the Rojas"). RLR also seeks an order fixing the lien of the Rojas in accordance with 11 U.S.C. § 365(j) and vacating the *lis pendens* filed by the Rojas with the Clerk of Rockland County, New York. The Rojas oppose the debtor's motion and contend that as a result of the debtor's prepetition breach of contract, the Rojas were relieved of their obligation to perform, with the result that the contract is not executory within the meaning of § 365 and may not be rejected. The court concludes that the contract is executory and may be rejected by the debtor, subject to the Rojas' lien under 11 U.S.C. § 365(j) and their claim for damages in accordance with 11 U.S.C. § 365(g)(1) and 502(g).

### FINDINGS OF FACT

1. The debtor is a New York corporation which filed with this court a petition for relief under Chapter 11 of the Bankruptcy Code on September 1, 1989 and continued to operate and manage its business of real estate development as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2. On December 18, 1987, the debtor entered into a real estate development contract with Dr. Edgar J. Rojas and his wife, Evelyn, for the purchase of land and the construction of a single family residence in Pine Glen Woods in Orangetown, New York. The contract was back-dated to December 15, 1987 because the debtor wanted the real estate agent who brought the parties together to earn her commission even though her employment was terminated shortly thereafter.

3. The contract between the parties reflects a purchase price of $770,000.00. However, the original purchase price was $800,000, but the Rojas made an advance payment to the debtor in the sum of $30,000, thereby reducing the contract price to $770,000.

4. Thereafter, the Rojas authorized a series of extras, referred to as change or-

ders, for modifications to the premises, including the construction of a swimming pool, which increased the contract price. The contract provides that the Rojas are obligated to pay for the additional change orders as part of the purchase price.

5. The legitimacy of certain additional changes claimed by the debtor is disputed by the Rojas. After the debtor obtained a site plan approval for the proposed residence, from the local town Architectural Review Board, it learned from an employee of the debtor's engineer that the proposed location of the house would violate a local side yard restriction, with the result that the house had to be constructed 12 feet closer to the road. The relocation increased the excavation and labor costs by $23,460.07. Although this change was caused by the debtor's own mistake, it seeks to saddle the Rojas with this item as an additional expense. Included in this $23,460.07 figure is a supervision charge which Robert Robie, the debtor's president, estimated his supervision services were worth, although he was not paid this sum by the debtor.

6. In light of the escalated purchase price expenses claimed by the debtor and the unwillingness of the debtor's construction loan mortgage lender, Ponce DeLeon Savings Bank, to extend construction financing beyond $550,000.00, the Rojas chose to obtain a different mortgagee to finance their purchase of the house, namely, Residential Mortgage Services. The change in mortgagee was also preferable to the Rojas because they could pay a smaller origination fee and obtain a mortgage for a longer period of time and upon more favorable terms. In May of 1989, the Rojas obtained a commitment from Residential for a $618,750 mortgage.

7. Because the Rojas chose not to remain with the debtor's construction loan mortgagee, Ponce DeLeon Savings Bank, the debtor added its construction mortgage costs to the purchase price in the amount of $32,382.00. This additional charge is based on the language in paragraph # 32 of the Rider annexed to the purchase contract, which reads:

32. All of the costs and expenses incurred in placing and closing any mortgage loan or loans regarding this transaction shall be borne by purchaser, including, but not limited to, application, appraisal and credit fees, origination fees, "points" charged by the lender, mortgage tax, mortgage title insurance, and mortgage recording fees.

The Rojas contend that the foregoing language relates to the mortgage obtained by a potential purchaser and not to the construction loan obtained by the debtor.

8. The Rojas dispute this $32,382.00 charge and contend that their maximum liability is $500 in accordance with paragraph # 24 in the Rider annexed to the contract, which relates to the debtor's construction loan, and provides as follows:

24. Purchaser has been advised that the seller's construction loan is placed with Ponce DeLeon Savings Bank, and if the seller shall elect to obtain their first mortgage loan from any other lending institution, purchaser shall pay seller the sum equivalent to the total mortgage tax of seller together with Bank counsel fees, in no event to exceed $500.00.

9. The debtor also contends that after the contract was executed on December 18, 1987, it sustained increased costs for materials and labor during the course of constructing the house for the Rojas, which amounts should be added to the purchase price as cost escalations authorized under paragraph # 21 of the Rider annexed to the contract, which provides:

21. The price for completion of the structure is subject to change, to the extent of any difference in cost of labor and materials as of this date and the actual cost to the seller at the time the materials were purchased and the work is done; it being understood, however that Purchaser shall pay up to Ten Thousand ($10,000.00) Dollars therefor, provided the seller can show documentation demonstrating interim price increases by suppliers and that the seller has made a reasonable attempt to find the best price on such items. Seller shall pay any excess beyond this point.

10. All change orders agreed to between the parties also increased the purchase price by $30 for each change order, as agreed to in paragraph # 22 of the Rider annexed to the contract, which reads:

22. Any change order (except for allowance items) will be charged at Thirty ($30.00) Dollars for each change order (to the purchaser).

11. Although the contract for the construction of the house was signed on December 18, 1987, there was a delay in construction due to the cold winter weather which made excavation work difficult. It was not until February of 1988 that the debtor first learned that its engineer's site plan incorrectly encroached upon a side yard restriction which required a relocation of the purposed foundation 12 feet closer to the road.

12. In April of 1988 the debtor and the Rojas agreed to change order # 2 which called for adding a swimming pool to the project. The Rojas agreed to pay an initial $10,580.00 towards the cost of the pool, paying $2,000.00 on signing change order # 2, $4,500.00 on May 21, 1988 and $4,080.00 on July 21, 1988.

13. The Rojas maintain that they expected to pay for the balance of the additional charges for the swimming pool at the closing of title. The debtor contends that the cost of the swimming pool, which was an additional $52,900.00, was to have been paid by the Rojas before title closing and that the parties anticipated that the money for the swimming pool would come from the debtor's construction loan with Ponce DeLeon Savings Bank as an accommodation only, but if the funds were not received under the construction loan, the Rojas would pay the cost of the pool. The debtor relies on paragraph # 2 of change order # 2 which states that the pool would be supplied "contingent on receipt of additional financing as part of total constructing loan package."

14. The Rojas contend that when the debtor received an additional construction loan from Ponce DeLeon Savings Bank in the sum of $400,000 in late May of 1988, there was included in that amount the sum of $50,000.00 towards the swimming pool. The debtor denies that it received any additional funds from its construction loan for the swimming pool. Therefore, the debtor asserts that it made a mistake in applying construction loan funds towards the swimming pool project, with the result that it ran out of money to pay its other contractors and suppliers on the Rojas project. Indeed, the debtor's president, Robert Robie, testified that he advanced $23,000.00 of his own funds towards the job, although the debtor, nevertheless, ran out of funds and could not fully complete the project. Hence, the debtor states that it made a mistake when it continued to construct the swimming pool.

15. Robert Robie, the debtor's president, said in his supporting affidavit, sworn to November 8, 1989, as follows:

Hindsight being what it is, it is obvious that RLR should never have started construction of the swimming pool without having the full Fifty Two Thousand Nine Hundred ($52,900.00) Dollars required for that change order. Unfortunately, however, RLR began construction of the pool and although demands were made to Rojas to supply RLR with the money for the pool and despite the clear language of the contract, the money was not forthcoming. One of the many reasons why the contract did not close is because of the partially built swimming pool, which does not have a Certificate of Occupancy.

Mr. Robie testified to the same effect at the hearing on this motion. Additionally, the debtor's real estate lawyer, C. Robert Clemensen, testified that he told the Rojas' real estate lawyer, Murray Klein, that if sufficient money was available after paying the other construction creditors, there would then be enough to pay for the pool from the debtor's construction loan. However, the debtor did not have sufficient funds to satisfy the construction costs, with the result that the debtor could not obtain a Certificate of Occupancy for the pool in order to proceed with the closing of title on the project.

16. The Rojas visited the construction site on a regular basis, almost every week-

end, to observe the step by step progress in the construction of their new house. They brought family members with them and also video taped the project as the construction progressed each week. Mrs. Rojas testified that at one point during their visit to the site, in November of 1988, the debtor's president, Mr. Robie, asked to borrow $10,000.00 from them for his construction costs, which sum would be applied in reduction of the contract price at the closing. The Rojas complied with this request and advanced the $10,000.00 sum.

17. Mrs. Rojas testified that they were reassured by the debtor's president, Robert Robie, that it would be easier to build a swimming pool as part of the construction job rather than waiting until later when they might better afford the cost of putting in a pool after the house was built. Mr. Robie advised the Rojas that he could get the money from the construction loan and that they could get the money later from their bank under their mortgage loan for the closing of title. Mrs. Rojas testified that at no time before the first scheduled closing on June 22, 1989 did Mr. Robie ever tell them that he could not obtain additional construction money to complete the pool.

18. Dr. Rojas confirmed his wife's testimony and stated that he paid the additional $10,000.00 advance requested by Mr. Robie in November of 1988. Dr. Rojas also testified that before March 31, 1989, there never was any discussion with Mr. Robie regarding any additional costs for relocating the house 12 feet closer to the road. He also testified that before the end of March of 1989, there never was any discussion with Mr. Robie regarding a claim by the debtor for added mortgage costs which the debtor later claimed in the sum of $32,-382.00.

19. Mrs. Rojas testified without contradiction that Mr. Robie consented to allowing various installations at the house before the scheduled title closing. She said that Mr. Robie allowed blinds to be installed on the windows, carpeting on the stairs, chandeliers in the rooms and various other items. Mr. Robie consented to this work being done and allowed the installers into the house each time they arrived. Mrs. Rojas testified that they paid $24,121.51, less $12.00 for paint used elsewhere, for a net advance towards the house of $24,-109.51.

20. On March 2, 1989 a Certificate of Occupancy was issued for the house, but not for the swimming pool. On March 17, 1989, the debtor's real estate lawyer, C. Robert Clemensen, sent a letter to Murray Klein, the Rojas' lawyer, advising him that the debtor was ready to close title in 15 days. He did not select a specific closing date. Notwithstanding this letter, the debtor had not received a Certificate of Occupancy for the pool and had not completely finished the contracted for work. There was approximately $20,000.00 of additional work to be performed as reflected on a "punch list" that Mr. Robie and Dr. Rojas later compiled on April 22, 1989.

21. On March 31, 1989, the debtor's real estate lawyer, C. Robert Clemenson, wrote a letter to Murray Klein, the real estate lawyer for the Rojas', in which he informed Mr. Rojas that the debtor claimed additional purchase price amounts, including the house plan site relocation charges of $23,-460.07, the debtor's construction loan mortgage costs charges of $32,382.00 and some additional charges, including interest on the debtor's construction loan mortgage from April 17, 1989, the date that the debtor calculated should have been the latest time for scheduling a closing of title.

22. The interest charged by the debtor from April 17, 1989, the day that the debtor considered should be treated as the original date for closing title, was based on paragraph # 39 in the Rider to the real estate development contract, which provides as follows:

39. If the closing of title is adjourned, at the request of purchaser, more than thirty (30) days from the original date set by seller, but in no event earlier than the closing date in this contract, and provided a Certificate of Occupancy is issued and the bank is ready to close, purchaser shall pay interest on the balance of the purchase price at the same rate of interest contained in the mortgage to be ob-

tained but in no event to be less than 12 per cent per annum, from the date set forth for the closing to the actual date of closing, adjusted on a per diem basis. In addition, it is understood and agreed that in such event, adjustment for taxes and insurance will be made as of the date set for the closing by seller, in addition to the interest charge set forth in this paragraph. The provisions of this paragraph shall apply only if the adjournment is through no fault of the seller and provided the premises are completed as provided for in this contract.

23. There were various communications and discussions between the parties in April and May of 1989, wherein the Rojas disputed the legitimacy of the additional charges other than for the swimming pool. Because of the dispute as to the additional charges and because the debtor had not fully completed the construction of the house or the swimming pool, no closing date could be scheduled.

24. As of May 19, 1989, the Rojas had paid the debtor for all additional charges for which invoices had been submitted. No invoices were submitted to them by the debtor for the additional change orders which were disputed, including the additional house relocation charges after the site plan had been approved. The debtor had not submitted any invoices to the Rojas for the balance of the swimming pool costs beyond the advances previously paid by the Rojas.

25. At a meeting held in C. Robert Clemensen's office on May 30, 1989, the parties arrived at a partial solution to their problems. It was agreed that the disputed additional charges of approximately $62,-000.00, which the Rojas claimed were not legitimate, would be submitted for settlement by binding arbitration in accordance with the rules of the American Arbitration Association, as provided for in paragraph # 17 in the Rider annexed to the contract. With the disputed items reserved for arbitration, the parties then scheduled a closing for June 22, 1989.

26. On June 21, 1989, Residential Mortgage Services, the institution which was going to finance the Rojas' mortgage loan, called their attorney, Murray Klein, and informed him that they could not proceed with the closing because the debtor had not completed the swimming pool and had not obtained a Certificate of Occupancy for the pool. Klein told Clemensen that Residential Mortgage Services wanted a $20,-000.00 escrow in order to proceed with the closing. Clemensen said that the financing for the pool was not the debtor's responsibility and that the debtor would not agree to posting an escrow. A new closing date was scheduled for July 18, 1989 at 11:00 A.M.

27. On June 29, 1989, the debtor's real estate lawyer, C. Robert Clemensen, notified the attorney for the Rojas that in view of the aborted June 22nd closing, the debtor would exercise its contract right to market the house.

28. On July 15th, the Rojas visited the construction site and met Mr. and Mrs. Robie in the house. Dr. Rojas discussed settlement with Mr. Robie and agreed to split the disputed additional costs by paying half. The parties then worked out a written agreement entitled "Rojas/Robie Agreed Final Figures For Settlement Dated 7/15/89". Pursuant to this signed and written agreement, they agreed upon a final figure in the amount of $687,314.43, to be paid by the Rojas at the closing, after crediting the Rojas for the payments previously made by them.

29. The debtor contends that on the evening of July 15, 1989, Robert Robie telephoned Dr. Rojas and informed him that Robie had made a mistake in his settlement figures and that he inadvertently had given the Rojas an additional credit of $40,000.00 which duplicated credits to which the Rojas were entitled. Dr. Rojas denied that Robie called him on the evening of July 15, 1989. Mrs. Rojas testified that Robie conveyed this information to her on July 18, 1989 at 1:00 P.M. after the scheduled closing for 11:00 A.M. on July 18, 1989 failed to take place.

30. The scheduled closing for July 18, 1989 at 11:00 A.M. did not take place because the debtor and its lawyer did not

attend. The Rojas and their lawyer attended the closing with the title company representative and their mortgage lending institution. The Rojas had obtained a certified check for the closing and had refinanced the mortgage on their current home, so that they could tender the purchase price previously agreed to between the parties. The fact that the debtor had not completed the swimming pool, the landscaping and about $20,000.00 worth of additional items, were matters that were included as credits in the settlement that the parties reached on July 15, 1989.

31. On the morning of the scheduled closing on July 18, 1989, the debtor's lawyer, Clemensen, telephoned Klein, the real estate lawyer for the Rojas, at approximately 9:30 A.M. and informed Klein that the debtor and Clemensen would not go to the closing. Klein testified that Clemensen said that the debtor could not get a satisfaction of mortgage from a Randy Hess, who held a $60,000.00 mortgage to secure an advance to the debtor which was given as part of a participation in the profits from the construction and sale of the Rojas' house. Evidently there was going to be no profit available for Randy Hess and he was unwilling to issue a satisfaction of his mortgage which interfered with the title the Rojas expected to receive. Klein testified that he told Clemensen he could not understand why Clemensen waited until the last minute to tell Klein about the problem. Klein informed Clemensen that, nonetheless, Klein intended to go to the closing with his clients.

32. About 45 minutes after the scheduled 11:00 A.M. closing on July 18, 1989, Klein telephoned Clemensen and told him that Dr. and Mrs. Rojas, and their representatives were at the closing and prepared to tender their money. Clemensen said that there was a mistake in the written settlement agreement dated July 15, 1989 and there was a problem in obtaining a satisfaction of the $60,000.00 mortgage held by Randy Hess. Clemensen also testified that there were insufficient funds available to pay the construction creditors and also leave enough funds to post a $20,000.00 escrow to cover the unfinished swimming pool costs in order to induce the mortgagee to proceed with the closing, in the absence of the issuance of a Certificate of Occupancy for the swimming pool.

33. In view of the fact that the debtor did not appear at the scheduled closing and was unwilling to close, the Rojas then filed and had served their state court summons and complaint dated July 18, 1989, which sought specific performance from the debtor with respect to the title to the house which they contracted with the debtor to have constructed and sold to them.

34. On September 1, 1989, the last day for the debtor to answer the complaint for specific performance, the debtor filed its Chapter 11 petition with this court.

35. In addition to the improvements which the Rojas installed in the house in the sum of $24,109.51, it was stipulated that they paid to the debtor the sum of $218,040.87, for a total of $242,150.38. This amount will qualify for the lien to which a purchaser not in possession is entitled to claim when an executory contract for the purchase of real estate is rejected by a vendor debtor in possession, in accordance with 11 U.S.C. § 365(j).

36. If the debtor is not permitted to reject the contract with the Rojas and is required to perform it in accordance with the written settlement agreement executed by the parties on July 15, 1989, the unsecured creditors will receive no dividend because the results would be as follows:

| | |
|---|---|
| Net Purchase Balance Due | $687,314.43 |
| –Cost to complete | 20,000.00 |
| –Broker's Commission | 20,000.00 |
| –Construction Mortgage with interest/approximately | 600,000.00 |
| –Randy Hess Mortgage with interest/approximately | 70,000.00 |
| –Taxes due | 4,378.78 |
| –Closing costs | 10,000.00 |
| Total Closing Costs | $724,378.78 |
| Deficiency | $ 37,064.35 |

37. If the debtor is permitted to reject the contract with the Rojas and is able to resell the property for the market value of $1,200,000.00, as valued by its appraiser, whose testimony was not contradicted, the results would be as follows:

| | |
|---|---:|
| Market Value | $1,200,000.00 |
| –Cost to Complete | 20,000.00 |
| –Construction Mortgage with interest/approximately | 600,000.00 |
| –Randy Hess Mortgage with interest/approximately | 70,000.00 |
| –Taxes due | 4,378.78 |
| –Closing Costs | 10,000.00 |
| –Rojas Secured § 365(j) lien | 242,150.38 |
| | $ 946,529.16 |
| Available for unsecured claims | $ 253,470.90 |

38. It therefore appears that in the exercise of the debtor's business judgment, it is in the interests of the estate that the contract may be rejected by the debtor because the general unsecured claims may receive a dividend upon rejection and resale for what has been shown to be the market value of $1,200,000.00. If the contract is performed in accordance with the figures agreed to by the parties on July 15, 1989, there will be no funds available for distribution to the general unsecured claims.

39. Upon rejection of the contract, the Rojas will have an unsecured prepetition claim for damages which will include the loss of their bargain, the cost to refinance their present house in order to fund the purchase price, the attorney's fees incurred in the unsuccessful effort to obtain title to the premises in question and all other consequential costs and interest incurred as a result of their aborted transaction with the debtor.

40. The *lis pendens* which the Rojas filed with the Clerk of the County of Rockland, New York, will not be vacated as requested in the debtor's motion. In the event that this Chapter 11 case is dismissed or converted, or if the debtor is unable to resell the premises in question, the Rojas are entitled to rely upon their prepetition rights, including the *lis pendens* and their state court suit for specific performance.

## DISCUSSION

The debtor's rejection of an executory contract pursuant to 11 U.S.C. § 365 is not simply a judicial reward for blunders or incompetence. A debtor is permitted to reject an executory contract because the debtor has either already defaulted in its performance under the contract or finds that it is uneconomical to complete in accordance with its terms. In these circumstances the debtor is given an option under 11 U.S.C. § 365 to either assume the defaulted contract by curing the defaults or, providing adequate assurance of prompt cure and by providing adequate assurance of future performance, or rejecting the executory contract. In the event that the debtor rejects an executory contract to sell real property, the nondebtor purchaser who is not in possession is given a lien under 11 U.S.C. § 365(j) for the recovery of any portion of the funds advanced by the nondebtor for the purchase of that property. Additionally, the purchaser is given a prepetition unsecured claim for damages arising from the debtor's breach of the executory contract in accordance with 11 U.S.C. §§ 365(g)(1) and 502(g).

In the instant case the debtor committed various blunders under the real estate development contract with the Rojas. The debtor mistakenly obtained approval of a site plan with the location of the proposed house in violation of certain side yard restrictions. The required relocation of the house increased the costs in excess of $23,000.00. The debtor mistakenly led the Rojas to believe that its construction loan would sufficiently finance the construction of the added swimming pool and that after the initial advance of funds by the Rojas, the balance owed could be paid at the time title closed. The delay in commencing excavation work because of the cold winter weather and the inability of the debtor to completely fund the swimming pool construction under the debtor's construction loan, caused further delay in scheduling a closing with the result that the construction loan interest continued to mount. The debtor mistakenly believed that it could obtain for the closing a satisfaction of the mortgage held by one Randy Hess, who originally advanced $60,000.00 to the debtor in the belief that he would participate in the profits from the debtor's transaction with the Rojas. The debtor failed to invoice the Rojas for many change orders with the result that they disputed the legitimacy of the additional charges. The debtor's president admitted that the debtor

made a mistake in continuing to work on the swimming pool after a dispute arose as to the source of the funding, with the result that the debtor used funds from the construction loan and exhausted its finances before it could complete all the work required under its contract with the Rojas. The debtor's president made a major blunder when he entered into a written agreement on July 15, 1989, resolving all of the disputes with the Rojas concerning the balance of the purchase price due and settling the final figure as $687,314.43, only to discover later that a credit was allegedly duplicated and that the written agreement was inaccurate. Finally, the debtor and its real estate lawyer failed to obtain a Certificate of Occupancy for the uncompleted swimming pool and refused to post a $20,-000.00 escrow required by the mortgage bank in order to proceed with the closing. With all of these mistakes and blunders as part of their track record, the debtor and its real estate lawyer put their heads in the sand and failed to attend the closing which they scheduled for July 18, 1989.

The legislative history to 11 U.S.C. § 365 explains that an executory contract is a contract under which performance remains due to some extent on both sides. S.Rep. 989, 95th Cong., 2d Sess. 58 (1978) and H.Rep. 595, 95th Cong. 1st Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Generally, the performance due on both sides must be significant. If the only remaining obligation on the part of a seller of real estate who holds legal title in trust for the purchaser is to deliver legal title upon the completion of the contract is not executory because the delivery of legal title is a mere formality. *Mitchell v. Streets* (*In re Streets & Beard Farm Partnership*), 882 F.2d 233 (7th Cir.1989). On the other hand, a real estate contract does not cease to be executory when there is a tender of performance by the purchaser, because performance and not just tender is required. *Benevides v. Alexander* (*In re Alexander*), 670 F.2d 885 (9th Cir.1982). In the instant case, the purchasers tendered payment but the debtor, as seller, did not attend the scheduled July closing and refused to deliver title to the purchasers

for the balance due as agreed to in the written settlement dated July 15, 1989. From these facts, the Rojas, as purchasers, reason that the debtor's breach of contract rendered the real estate development contract nonexecutory.

The Rojas contend that despite the fact that the debtor had not completed the swimming pool and had to perform additional construction work which would cost approximately $20,000.00 to complete, once the contract was breached by the debtor it ceased to be executory because the Rojas had no further duty to perform as purchasers, citing *In re Murtishi*, 55 B.R. 564 (Bankr.N.D.Ill.1985). In that case, it was held that a debtor's prepetition breach of a real estate contract to sell a residence operated to terminate the debtor's obligation to do anything in the future and also relieved the purchaser from further performance because the purchaser had materially performed by tendering the purchase price. Therefore, the court concluded that the contract was no longer executory because the court could not resurrect a contract which had been breached prepetition, nor could the debtor reject it.

The reasoning in the *Murtishi* case, supra, elides the fact that 11 U.S.C. § 365 expressly authorized the resurrection of a contract that was breached by a debtor before the bankruptcy petition was filed. There is a distinct difference between a contract that was terminated as a matter of law before the commencement of the bankruptcy case and a contract that was breached by a debtor, or where the debtor has defaulted, but when the contract has not been terminated and is still enforceable. A contract that was terminated before the filing of the bankruptcy case may not be resurrected.

This interpretation of section 365(e)(1) is consistent with the recognized principle of bankruptcy law that an executory contract or lease validly terminated prior to the institution of bankruptcy proceedings is not resurrected by the filing of the petition in bankruptcy, and cannot therefore be included among the debtor's

assets. See *In re Commodity Merchants, Inc.*, 538 F.2d 1260, 1263 (7th Cir.1976); *In re GSVC Restaurant Corp.*, 10 B.R. 300, 302 (D.C.S.D.N.Y. 1980); *In re Youngs*, 7 B.R. 69, 71 (Bkrtcy., D.Mass.1980); *In re Mimi's of Atlanta, Inc.*, 5 B.R. 623, 627–29 (Bkrtcy., N.D.Ga.1980), aff'd and remanded, 11 B.R. 710 (D.C.N.D.Ga.1981); *In re Bronx–Westchester Mack Corp.*, 4 B.R. 730, 731 (Bkrtcy., S.D.N.Y.1980); Fogel, *Executory Contracts and Unexpired Leases in the Bankruptcy Code*, 64 Minn.L.Rev. 341, 346 (1980). As the court observed in *In re Butchman*, 4 B.R. 379, 381 (Bkrtcy., S.D.N.Y.1980), "When a debtor's legal and equitable interests in property are terminated prior to the filing of the petition with the Bankruptcy Court that was intended to preserve the debtor's interest in such property, the Bankruptcy Court cannot then cultivate rights where none can grow." See also *Bank of Marin v. England*, 385 U.S. 99, 101, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966) ("[t]he trustee succeeds only to such rights as the bankrupt possessed").

*Kopelman v. Halvajian, (In re Triangle Laboratories, Inc.)*, 663 F.2d 463, 467–68 (3rd Cir.1981).

■ However, a contract that was breached by a debtor, or where the debtor has defaulted in performance, may be assumed by the debtor, with court approval, if the debtor complies with the conditions delineated in 11 U.S.C. § 365(b)(1). Similarly, a contract is not deemed terminated and no longer executory simply because the debtor has defaulted or breached the contract before the commencement of a bankruptcy case. *Benevides v. Alexander (In re Alexander)*, 670 F.2d at 887. To rule otherwise would contravene the express authorization for curing defaults as expressed in 11 U.S.C. § 365(b)(1). Indeed, the Rojas have treated the contract as still in effect and want the debtor to perform its obligations under the contract, including conveying title to them. They have not exercised their option to treat their own obligation to pay the balance of the purchase price as discharged by simply claiming damages for the debtor's breach.

In a case which is strikingly similar to the facts in this case, it was noted that most debtors have breached at least some executory contracts before filing bankruptcy petitions and have thereafter exercised their options under 11 U.S.C. § 365(b)(1) because the contracts were executory. *In re W. & L. Associates, Inc.*, 71 B.R. 962 (Bankr.E.D.Pa.1987). Those cases cited by the Rojas which denied a debtor the right to reject a real estate contract under 11 U.S.C. § 365 because the contract was not executory are cases where the contract was deemed terminated under state law, primarily because the purchaser had obtained a prepetition judgment for specific performance. See, e.g. *In re Roxse Homes, Inc.*, 74 B.R. 810 (Bank.D.Mass.1987), aff'd 83 B.R. 185 (D.Mass.1988); *In re Pribonic*, 70 B.R. 596 (Bank.W.D.Pa.1987).

Although specific performance had not yet been directed in *In re Lewis*, 94 B.R. 789 (Bank.D.Mass.1988), the court concluded that the sale of real estate was a unique property right and that the debtor's duty of specific performance could not be rejected under Massachusetts law. This case ignores the supremacy of 11 U.S.C. § 365 in favor of state law as if no bankruptcy had occurred and is inconsistent with the Bankruptcy Code. The rationale for the *Lewis* case is more in line with the decisions involving land installment contracts which are treated as security agreements. The courts have treated land installment contracts as nonexecutory because the arrangement was viewed as a security agreement where the vendors held legal title in trust solely as security for the payment of the purchase price and had no significant obligations other than the ministerial function of delivering legal title upon the completion of the payments. *Mitchell v. Streets (In re Streets & Bears Farm Partnership)*, 882 F.2d at 235; *In re Booth*, 19 B.R. 53 (Bank.D.Utah 1982).

In the instant case, the debtor has not completed the swimming pool, is still obligated to landscape the premises and perform about $20,000.00 worth of uncomplet-

ed projects in addition to its obligations to convey title to the debtor and obtain a satisfaction of the Randy Hess mortgage, which was originally $60,000.00, exclusive of interest. Because the purchasers wish to waive their option to treat the contract as terminated by filing a claim for damages together with a lien for their advances, and instead, seek to obtain title to the property in question, they cannot also maintain that the debtor's obligations under the open contract are not executory.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter in accordance with 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. The real estate development contract between the debtor and the Rojas is an executory contract within the meaning of 11 U.S.C. § 365(a).

3. The debtor's motion for permission to reject its executory contract with the Rojas pursuant to 11 U.S.C. § 365(a) is granted because the debtor has established in the exercise of its business judgment that such rejection is in the best interests of the estate.

4. Upon rejection by the debtor, the Rojas shall have a lien against the property for their advances towards the purchase of the real estate in the amount of $242,150.38 in accordance with 11 U.S.C. § 365(j).

5. Upon rejection by the debtor, the Rojas shall also have a prepetition unsecured claim for damages which will include the loss of their bargain, the cost of refinancing their present house in order to fund the purchase price, the attorneys fees incurred in the unsuccessful effort to obtain title to the property in question and all other consequential costs and interest incurred as a result of the debtor's rejection of the executory contract in question.

6. The debtor's request to vacate the *lis pendens* filed by the Rojas with the Clerk of the County of Rockland, New York, is denied because the Rojas are entitled to rely upon their prepetition rights in

the event this case is dismissed or converted to Chapter 7, or if the debtor is unable to resell the property.

SETTLE ORDER ON NOTICE.