**In re BROADSTRIPE, LLC, et al., Debtors.**

**Broadstripe, LLC, et al.**

v.

**National Cable Television Cooperative, Inc.**

Bankruptcy No. 09–10006 (CSS).

Adversary No. 09–50024.

United States Bankruptcy Court, D. Delaware.

March 9, 2009.

As Amended March 10, 2008.

Amanda Marie Winfree, Don A. Beskrone, Ashby & Geddes, P.A., Wilmington, DE, for Broadstripe, LLC, et al.

Robert W. Mallard, Dorsey & Whitney LLP, Wilmington, DE, for National Cable Television Cooperative, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHRISTOPHER S. SONTCHI, Bankruptcy Judge.

On February 19 and 20, 2009, the Court conducted a hearing on the Debtors' request for preliminary injunctive relief against the National Cable Television Cooperative, Inc. ("*NCTC*") in the above-captioned adversary proceeding (the "*Adversary Proceeding*"). Appearing at trial were counsel for Broadstripe, counsel for NCTC and other appearances as noted in the record.

The Court has reviewed and considered the arguments of counsel, the testimony of witnesses, the exhibits admitted into evidence at trial and the documents and pleadings filed in connection with this Adversary Proceeding.[1] Based upon the rec-

1. References to "Exhibit ___" herein are to the corresponding exhibits admitted into evi-

ord, the Court now finds and concludes as follows, pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable in this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7052.[2]

## I.

### FINDINGS OF FACT

#### A. Jurisdiction and Venue.

1. The Court has jurisdiction over this Complaint and the causes of action asserted herein under 28 U.S.C. §§ 1334 and 157.

2. The causes of action asserted herein are core proceedings under 28 U.S.C. §§ 157(b)(2)(A), (B), (E), (K) and (O).

3. Venue of this action is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4. This Court has the power and is authorized to grant the requested injunctive relief pursuant to 11 U.S.C. § 105(a),[3] and has the power and is authorized to provide the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

#### B. Procedural History

5. On January 2, 2009 (the *"Petition Date"*), Broadstripe, LLC (*"Broadstripe"*) and certain of its direct and indirect affiliates (collectively, the *"Debtors"*) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

6. This adversary proceeding was commenced by the filing of a complaint and a *Motion for Declaratory and Injunctive Relief* on January 14, 2009. Following a

hearing on January 15, 2009, the Court entered its *Order Granting Motion for Declaratory and Injunctive Relief,* declaring that the Member Agreement (defined below) is an executory contract and temporarily enjoining NCTC from excluding Broadstripe from participating in new and existing Master Agreements (defined below).

#### C. The National Cable Television Co-operative.

7. NCTC is a not-for-profit entity. As stated in its bylaws, The principal goal of NCTC is—

to reduce the operating costs of its members. The strategy used will be to lawfully and ethically combine the individual purchasing powers of Member companies to achieve economies of scale commensurate to their aggregate size. The tactics used to achieve this goal and strategy shall include the execution and operation of master programming network affiliation agreements, bulk purchase contracts and other group purchasing arrangements as may be required to meet the needs of our Members.

Exhibit 15, at 1.

8. Broadstripe became a member of NCTC pursuant to the Member Agreement, dated July 14, 2000 (the *"Member Agreement"*). *Exhibit* 9, at 1.

9. Section 2 of the Member Agreement circumscribes the contractual relationship between NCTC and Broadstripe, stating that "the bylaws of NCTC, together with

---

dence during the hearing. References to "February 19 Transcript" and "February 20 Transcript" are to the transcripts of proceedings on February 19–20, 2009, respectively.

2. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent that any of the

following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

3. Unless otherwise noted, section (§ ) references herein are to title 11 of the United States Code (the *"Bankruptcy Code"*).

the terms of this Agreement, describe and define the relationship between Member and NCTC." *Exhibit* 9, at 1.

10. On behalf of its members, NCTC negotiates master programming agreements (*"Master Agreements"*), pursuant to which individual programmers agree to provide programming to participating members of NCTC. These may be distinguished from those agreements (*"Direct Agreements"*) that are negotiated directly between the operator (*e.g.,* Broadstripe) and the programmer (*e.g.,* Fox News Network). February 19 Transcript, at 22:22–23:10.

11. Master Agreements typically remain in effect for a defined period of time, at the end of which they may either expire or be extended by the parties, or the parties may enter into a new agreement. February 19 Transcript, at 23:17–25; 24:9–15.

12. Members of NCTC are then afforded "an opportunity to participate, subject to additional eligibility requirements or exclusions (penetration and otherwise) deemed appropriate by NCTC or provided in the applicable Master Agreements." Exhibit 9, at 2.

13. If the submitted documentation is in order, NCTC's function at that point is to forward that paperwork on to the programmer. February 20 Transcript, at 20:5–8.

14. If the documentation is deficient or incomplete in some regard, NCTC typically notifies the member of the deficiency and need for corrective action, usually within a day or two. February 20 Transcript, at 20:9–13. NCTC may also consult with the relevant programmer to resolve any issues that arise during the opt-in process or to negotiate any carveouts or exceptions necessary to facilitate the member's participation in a particular master agreement. February 20 Transcript, at 14:25–15:19.

15. Toward the end of each month, NCTC invoices Broadstripe for license fees due for services provided in that month under the various Master Agreements in which Broadstripe is a participant. Payment of each invoice is due on the 15th day of the following month, subject to an additional tend-day grace period. February 20 Transcript, at 53:20–54:22.

16. Upon the expiration of the 10–day grace period, NCTC automatically generates and sends a notice of termination to each member that has not remitted payment for that month's invoice. February 20 Transcript, at 55:1–10.

17. Pursuant to the Member Agreement and applicable Master Agreements, license fees owed for programming services are remitted by Broadstripe to NCTC, which then disburses collected funds to the applicable programmer. Exhibit 9, at 3.

18. As of the Petition Date, Broadstripe had not paid the amounts due for license fees for the months of November and December 2008 in the aggregate amount of $3,412,839.81, plus a prorated portion of the January 2009 invoice. Exhibits 3, 4.

19. That portion of NCTC's January 2009 invoice representing license fees incurred after the Petition Date was paid by Broadstripe on or about February 15, 2009. February 19 Transcript, at 117:23–25.

20. In addition, notwithstanding that Broadstripe has not been permitted to participate in the Fox News Network Affiliation Agreement, dated November 1, 2006 (the *"Fox News Master Agreement"*), Broadstripe remitted payment to NCTC for license fees due to the Fox News Network (*"Fox News"*) for January 2009 programming. February 19 Transcript, at 118:1–3. As of February 20, 2009 NCTC

had forwarded neither the System Participation Form nor the license fees remitted for January 2009 to Fox News. February 20 Transcript, at 75:2–11.

21. Although NCTC testified at the hearing that NCTC itself may be directly liable to programmers for uncollected amounts due from individual members, none of the Master Agreements admitted into evidence at the hearing purport to hold NCTC liable to the corresponding programmers for any license fees other than those actually collected from Broadstripe. Exhibit 6, at 14; Exhibit 25, at 10; Exhibit 26, at 14; Exhibit 27, at 14.

22. Testimony during the hearing also indicated that, to date, no programmers have communicated to NCTC that they intend to hold NCTC liable for unpaid amounts. February 20 Transcript, at 36:16–18. At present, therefore, any assertion by NCTC that it is itself subject to risk of loss on account of its claim against Broadstripe is speculative, as its claim against the estate remains contingent on one or more programmers actually holding NCTC liable for unpaid amounts due under one or more of the master agreements.[4]

23. In the absence of a binding contract, NCTC acknowledges that a programmer has no enforceable obligation to provide continued programming to an operator like Broadstripe. February 20 Transcript, at 10:24–11:1.

24. Simply entering into new direct agreements with programmers is not a viable option, as it is not unusual for programming agreements to take six months or more to negotiate. February 20 Transcript, at 17:9–21.

25. Both parties similarly acknowledge that it is rare for a programmer to actually terminate programming; however, it is not entirely unheard of. Frank Scotello, the Senior Vice President of Programming and Product Development at Broadstripe, described two instances in which a programmer actually terminated programming—a single baseball game in one case; a single basketball game in the other. In each case, Broadstripe and the programmer were parties to an existing direct agreement; however, that agreement did not extend to cover the additional programming. February 19 Transcript, at 25:2–27:23. Although alternative programming was provided—i.e., the channel did not go "dark" during that period—Mr. Scotello testified that both times Broadstripe's call center was flooded with calls from customers upset at the lack of programming. *Id.*

26. Mr. Scotello's testimony also indicated that even the largest operators (*e.g.,* Time Warner) may be pushed to the brink in the face of a threat of termination. February 19 Transcript, at 114:5–24.

27. Mr. Scotello also testified that, during his tenure at Disney, Disney terminated at least one *operator's* access to Disney programming based upon the nonpayment of outstanding license fees. February 19 Transcript, at 103:16–22. Accordingly, the evidence adduced at the hearing indicates that, notwithstanding that it may be a relatively rare occurrence, programmers can and will terminate an operator's programming based upon either the absence of a binding contract or nonpayment of license fees.

## D. The Attempted Termination and Bankruptcy Filing.

28. "[T]he bylaws of NCTC, together with the terms of [the Member Agreement], describe and define the relationship

---

4. Parenthetically, NCTC testified that, in an unrelated matter, it had previously paid a programmer for uncollected fees; however, that was apparently "a small liability." February 20 Transcript, at 53:11–15.

between [Broadstripe] and NCTC." Exhibit 9, at 1.

29. Section 2.06(b) of the Bylaws, "[t]he membership of any Member that is past due on any payment obligation to [NCTC] ... may be terminated by action of the President of the Corporation upon not less than five (5) days notice to the defaulting Member." Exhibit 15, at 1.

30. Paragraphs 9, 15 and 16 of the Member Agreement lead to a similar result, collectively providing that the failure to pay all obligations owing to NCTC constitutes a default under the Member Agreement that may serve as grounds for termination of membership. Member Agreement, at 3–5.

31. Accordingly, when a member fails to timely pay all amounts due to NCTC for license fees as and when they come due, NCTC's standard response to nonpayment of invoices is to send a notice of termination to the delinquent member. NCTC employs no other procedure to address nonpayment of invoices. February 20 Transcript, at 31:16–24, 32:4–11.

32. The notice of termination is a standard form (of which Exhibit 7 is an example) and notifies the member that its membership in NCTC will be terminated unless all outstanding amounts are paid within five days. February 20 Transcript, at 31:16–20.

33. Approximately 70–80 such notices are mailed each month to an equal number of NCTC's approximately 1,000 members. February 20 Transcript, at 55:24–56:4.

34. On December 26, 2008, NCTC notified Broadstripe by letter (the "*Termination Notice*") that, unless NCTC received full payment for all unpaid amounts by close of business Friday, January 2, 2009, Broadstripe's membership in NCTC would be terminated. Exhibit 7, at 1.

35. The January 2, 2009 commencement of these chapter 11 cases stayed the termination of Broadstripe's membership by operation of § 362(a), and NCTC concedes that Broadstripe continues to be a member of NCTC. February 20 Transcript, at 28:21–29:1.

36. Other than Broadstripe, all other members that have been delinquent in payments to NCTC and received a notice of termination have either paid all amounts owed to bring themselves current or been terminated pursuant to the foregoing procedure. February 20 Transcript, at 30:23–31:6.

## E. The Fox News Opt–In.

37. Prior to the Petition Date, Broadstripe was party to a direct programming agreement with Fox News, which expired by its terms on December 31, 2008. February 19 Transcript, at 38:7–14.

38. On December 31, 2008, Broadstripe submitted a "*System Participation Form*" to NCTC for the purpose of participating in the Fox News Master Agreement. Exhibit 5, at 1; February 19 Transcript, at 39:16–18.

39. At the time, Broadstripe believed it had submitted all the necessary paperwork. February 19 Transcript, at 40:12–16.

40. In order to participate under the Fox News Master Agreement, however, the terms of the Fox News Master Agreement require the Member to submit a "*Member Participation Agreement*", a form of which is appended as Schedule A to the Fox News Master Agreement. Exhibit 6, at 2.

41. Based on the lack of a Member Participation Agreement and NCTC's determination that Broadstripe was not a member in good standing, NCTC did not submit the System Participation Form to Fox News to complete the participation

process. February 20 Transcript, at 20:16–21:1, 25:8–11.

42. On or about January 5, 2009, Chad Coben and Frank Scotello from Broadstripe spoke with Jeff Abbas, Frank Hughes of NCTC regarding the bankruptcy filing and the Fox News opt-in paperwork. February 19 Transcript, at 127:9–128:2.

43. Also participating in that conversation was Melanie McMullen, who is the Director of Business and Legal Affairs at NCTC and serves as inhouse counsel. February 20 Transcript, at 8:1–21.

44. During that conversation, NCTC acknowledged that it had received the System Participation Forms for Fox News and the Reelz Channel, and were in the process of determining what to do with it. February 19 Transcript, at 129:4–12.

45. Contrary to the general practice of NCTC as described above, however, NCTC did not notify Broadstripe of the deficiencies in the opt-in paperwork submitted for Fox News until at least January 15, 2009. February 20 Transcript, at 20:16–23.

46. As of February 20, 2009, NCTC had not formally notified Broadstripe of the continuing deficiency in the Reelz Channel opt-in paperwork. February 20 Transcript, at 22:24–23:1.

47. Mr. Scotello, however, testified that he was not made aware of the deficiency in Broadstripe's submission until February 2, 2009, when he was contacted by Fox News. February 19 Transcript, at 97:25–98:10.

48. At that time, Fox News sent the Member Participation Agreement identified in this proceeding as Exhibit 8 to Mr. Scotello and asked him to sign and return it so that Fox News could send it to NCTC. February 19 Transcript, at 41:21–42:11; 97:12–20.

49. Broadstripe submitted the Member Participation Agreement to NCTC on February 16, 2009; however, it is actually dated December 31, 2008. Exhibit 8, at 1. Mr. Scotello testified that he dated it December 31, 2008 to coincide with the submission of the System Participation Form. February 19 Transcript, at 43:14–17.

50. As of February 20, 2009 (the date of the hearing), NCTC could not confirm whether it had submitted the Member Participation Agreement to Fox News. February 20 Transcript, at 21:2–11.

51. As justification for withholding the opt-in paperwork and failing to notify Broadstripe that corrective action was necessary, NCTC asserts that Broadstripe was not "a member in good standing" of NCTC at the time the paperwork was submitted. February 20 Transcript, at 20:24–21:1.

52. In support of its assertion that Broadstripe was not a member in good standing, NCTC points to paragraphs 9, 15 and 16 of the Member Agreement and Section 2.06 of the Bylaws. February 20 Transcript, at 25:19–32:11.

53. The Member Agreement, however, neither defines "good standing" nor indicates the qualifications necessary to maintain good standing with NCTC. Exhibit 9, *passim.* As noted above, the Bylaws simply state that the membership of any member that is past due on its payment obligations to NCTC may be terminated upon not less than five days notice to the member. Exhibit 15, at 1.

54. Alternatively, NCTC points to the Fox News Master Agreement (and other Master Agreements) as the source of the "good standing" requirement. February 20 Transcript, at 62:3–16.

55. Sections 1(i) and 11(b) of the Fox News Master Agreement, read together, state that a member must be "in good standing with the NCTC" to participate in the master agreement, and provide that a

member is in good standing if it is "current in its obligations to both NCTC and Network." Exhibit 6, at 2, 17.

56. According to NCTC, since Broadstripe is not current on its prepetition obligations to NCTC, Broadstripe cannot be considered "in good standing" as that phrase is defined in the Fox News Master Agreement.

57. Aside from the paperwork deficiency described above, NCTC denied Broadstripe participation in the Fox News Master Agreement because Broadstripe is not in "good standing" as that phrase is defined in the Fox News Master Agreement. February 20 Transcript, at 25:5–11.

58. Although NCTC does not assess its members' financial creditworthiness on a regular basis (outside of the initial application process), NCTC does periodically conduct such reviews where the member's creditworthiness is called into question. February 20 Transcript, at 11:16–12:11.

59. However, since the Petition Date, NCTC has not asked Broadstripe for any financial information to substantiate Broadstripe's creditworthiness, nor has NCTC made any inquiry into Broadstripe's ability to meet ongoing financial obligations. Indeed, it appears NCTC has made no effort whatsoever to educate itself about Broadstripe's actual financial condition. February 20 Transcript, at 12:15–13:9.

60. NCTC's concern, apparently, is that NCTC is not itself able to make certain representations contained the Fox News Master Agreement—for example, that Broadstripe was (or is) current in its payment obligations to NCTC. February 20 Transcript, at 74:2–11.

61. However, while NCTC in the past has worked with programmers and members to resolve deficiencies in paperwork or other issues, in the present case NCTC took no steps either to notify Broadstripe of the defects in its paperwork submitted December 31, 2008 or contact Fox News to inquire whether NCTC's concerns might be resolved through a waiver of certain representations and warranties or some other mechanism. February 20 Transcript, at 14:16–16:12. This differs from NCTC's normal procedures (as discussed above), and NCTC's departure from its normal procedures continued after it was enjoined on January 15, 2009.

62. Based on NCTC's assertion that Broadstripe is not "a member in good standing," NCTC (in the absence of a court order directing them to the contrary) intends to deny Broadstripe access to other Master Agreements in which Broadstripe is not already a participant. February 20 Transcript, at 95:9–22.

63. It is undisputed that Broadstripe is not currently a party to the Fox News Master Agreement. NCTC does not contend that the Fox News Master Agreement describes and defines the relationship between Broadstripe and NCTC. Nevertheless, it is NCTC's position that Broadstripe is not "a member in good standing" under the Member Agreement because of the aforementioned provision contained in the Fox News Master Agreement. February 20 Transcript, at 92:18–23.

64. As noted above, however, the concept of "good standing" is nowhere defined or described in the documents governing the relationship between Broadstripe and NCTC—the Member Agreement and the Bylaws. Exhibit 9, 15, *passim.*

65. Therefore, while "good standing" may be a prerequisite to participation in the Fox News Master Agreement (presumably subject to waiver by Fox News), it is not a prerequisite to the exercise of Broadstripe's rights under the Member Agreement itself.

## II.

## CONCLUSIONS OF LAW

### A. The Standard for Injunctive Relief.

66. Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, this Court has the equitable power to issue temporary restraining orders (TRO) and preliminary injunctions. A party seeking a TRO or preliminary injunction must demonstrate: (i) a reasonable likelihood of success on the merits; (ii) a likelihood that it will suffer irreparable harm if relief is denied; (iii) that the nonmoving party will not suffer even greater harm if the injunction is granted; and (iv) that the public interest favors such relief. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir.2004); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 196 (3d Cir.2003).

67. In deciding whether to issue an injunction, the court must engage in "a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury." *GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharm. Corp.*, 197 Fed.Appx. 120, 124 (3d Cir.2006). Such a "delicate balancing" requires that the above-listed factors be weighed, rather than mechanically applied. *Id.*

### B. Probability of Success on the Merits (Count 1).

68. In Count 1 of the Complaint, Broadstripe seeks a declaration that the Member Agreement is an executory contract for purposes of § 365.

69. Section 365 does not define the term "executory contract;" however, both the legislative history and the majority of published decisions cite with approval the so-called Countryman definition, which has been expressed as follows: "A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts in Bankruptcy*, 57 Minn. L.Rev. 439, 446 (1973); *see also Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir.1989).

70. Broadstripe's continuing obligations under the Member Agreement include the obligations to (i) abide by the terms of the bylaws of NCTC, (ii) "maintain the confidentiality of Master Agreement terms and hardware purchase arrangement terms," and (iii) "indemnify NCTC from and against any liability and costs (including attorneys fees) incurred by NCTC as a result of Member's breach of [the Member Agreement], any Master Agreement ... or any disputes between members or between Member and a programmer or other vendor." Exhibit 9, at 1, 3 and 4.

71. NCTC's continuing obligations under the Member Agreement include the obligations to (i) "advise all members of the availability of Master Agreements and [ ] afford members an opportunity to participate," (ii) "assist[ ] members in the procurement of hardware," and (iii) "use its best efforts to negotiate favorable Master Agreements and hardware purchase arrangements." Exhibit 9, at 1, 2 and 4.

72. Based on the parties' respective continuing obligations under the Member Agreement, the Member Agreement is an executory contract.

73. Accordingly, the Court finds that Broadstripe is likely to prevail on Count 1 of the Complaint.

### C. Probability of Success on the Merits (Count 2).

74. In Count 2 of the Verified Complaint, Plaintiffs seek a declaration that,

pursuant to the terms of the Member Agreement, NCTC is obligated to afford Broadstripe the opportunity to participate in certain new and existing master agreements.

■ 75. Pending a debtor's decision to assume or reject an executory contract, courts have generally concluded that the contract is "enforceable by the debtor but not against the debtor." *U.S. ex rel. United States Postal Service v. Dewey Freight System, Inc.*, 31 F.3d 620, 624 (8th Cir. 1994); *see also In re FBI Distribution Corp.*, 330 F.3d 36, 43 (1st Cir.2003); *In re Travelot Co.*, 286 B.R. 462, 466 (Bankr. S.D.Ga.2002) ("During the pre-assumption period, although non-debtors are required to perform in accordance with a contract, the contract's terms are temporarily unenforceable against the debtor.").

■ 76. Although NCTC attempted to terminate Broadstripe's membership by sending the December 26 notice of termination (Exhibit 7), the termination process was stayed by operation of the automatic stay pursuant to § 362(a). 11 U.S.C. § 362(a).

■ 77. "[A] contract is not deemed terminated and no longer executory simply because the debtor has defaulted or breached the contract before the commencement of a bankruptcy case." *In re RLR Celestial Homes, Inc.*, 108 B.R. 36, 45 (Bankr.S.D.N.Y.1989). "Breach of a contract pre-petition by a soon-to-be debtor will not necessarily bar executory treatment of that contract in bankruptcy. Rather, a distinction must be made between a contract breached pre-petition and a contract terminated pre-petition under applicable non-bankruptcy law." *In re Bullet Jet Charter, Inc.*, 177 B.R. 593, 600 (Bankr.N.D.Ill.1995).

78. Accordingly, notwithstanding the attempted termination of the Member Agreement prior to the Petition Date, the Member Agreement continues to be an executory contract on and after the Petition Date that may be enforced by Broadstripe against NCTC, and NCTC is obligated to continue to perform under the Member Agreement, pending Broadstripe's decision to assume or reject.

■ 79. That Broadstripe may not be a member in "good standing" as alleged by NCTC offers no defense to NCTC's obligation to perform its obligations under the Member Agreement.

80. As noted above, the relationship between Broadstripe and NCTC—and the terms of Broadstripe's membership in NCTC—are defined by two documents: the Member Agreement and NCTC's Bylaws. Neither the Member Agreement nor the Bylaws define the concept of "good standing," nor do they contain any provision that conditions either Broadstripe's rights or NCTC's obligations on Broadstripe's good standing.

81. The concept of "good standing", which equates to being current in all payment obligations to NCTC, arises only under the Fox News Master Agreement, and is relevant only to Broadstripe's qualification to participate in the Fox News Master Agreement—not to NCTC's obligation to process Broadstripe's paperwork and forward it to Fox News to accept or reject.

82. It is notable in this regard that "good standing" under the Fox News Master Agreement relates to a representation that is made by the prospective participating member to Fox News—not NCTC. Accordingly, it is for Fox News to enforce—or waive—this representation. It is notable in this regard that Fox News specifically contacted Frank Scotello to provide Broadstripe with the Member Participation Agreement, asking Mr. Scotello to complete and return the form to Fox News so Fox News could then provide it to NCTC and "get you in to the NCTC

agreement." February 19 Transcript, at 41:21–42:20.

83. This conclusion is bolstered by the evidence of NCTC's prior history, which indicates that NCTC's sole traditional recourse against a delinquent member has been to terminate that member's membership pursuant to Section 2.06 of the Bylaws and paragraphs 9, 15 and 16 of the Member Agreement. The designation of Broadstripe as a member "not in good standing" appears to be a unique instance in NCTC's history.

84. Neither does NCTC's right to deny participation rights to Broadstripe "in its sole discretion" provide a legitimate justification for its refusal. In this case, NCTC's denial of Broadstripe's right to participate was based solely on a deficiency in paperwork that NCTC failed to disclose to Broadstripe and NCTC's belief that Broadstripe was not "in good standing." For the reasons stated below, NCTC's conduct violates the automatic stay pursuant to § 362(a), from which "sole discretion" provides no safe haven.

85. Effective as of the commencement of a case under title 11, § 362(a) stays, among other conduct:

(3) any act to ... exercise control over property of the estate[, and]

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. §§ 362(a)(3), (6).

86. As articulated in one noted bankruptcy treatise, "[e]xecutory contracts and leases are considered a form of property of the estate. As property of the estate, the debtor's interests in such contracts or leases are protected against termination or other interference that would have the effect of removing or hindering the debtor's rights in violation of section

362(a)(3)." Collier on Bankruptcy ¶ 362.03[5][a] (15th ed rev.).

87. By refusing to perform its obligations under the Member Agreement, NCTC is interfering with Broadstripe's property rights under the Member Agreement and acting in violation of the automatic stay. 11 U.S.C. § 362(a)(3).

88. NCTC's conduct in attempting to collect payment on all outstanding prepetition invoices as a precondition to allowing Broadstripe access to other Master Agreements further violates § 362(a)(6) of the automatic stay.

89. In light of the fact that NCTC was aware of the commencement of the Debtors' chapter 11 case, NCTC's violations of the automatic stay were willful. *See, e.g., In re Lansdale Family Restaurants, Inc.,* 977 F.2d 826, 829 (3d Cir.1992).

90. It is no defense to this conduct for NCTC to assert that individual programmers could themselves refuse to honor Broadstripe's participation requests based on Broadstripe's inability to represent that it is current on all payments to NCTC. The question of individual programmer's obligation to perform, or lack thereof, is not before the Court. This adversary proceeding is concerned with the enforcement of the Member Agreement as between NCTC and Broadstripe.

91. Notably, NCTC has received no instruction to date from any programmer directing NCTC to deny Broadstripe the right to participate in any master agreement. February 20 Transcript, at 14:4–8.

92. The Third Circuit has held that actions taken in violation of the stay are void *ab initio. See Raymark Indus., Inc. v. Lai,* 973 F.2d 1125, 1131 (3d Cir. 1992); *Maritime Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1206 (3d Cir. 1991). As such, NCTC's actions in violation of the automatic stay cannot possibly

form the basis for "additional eligibility requirements or exclusions (penetration and otherwise) *deemed appropriate* by NCTC."

93. In the absence of a legitimate basis upon which to deny Broadstripe participation rights under the Fox News Master Agreement or any other Master Agreement, pending Broadstripe's decision to assume or reject the Member Agreement pursuant to § 365, NCTC is obligated to perform its obligations under the Member Agreement and Bylaws, process any opt-in paperwork submitted by Broadstripe and submit that paperwork to the applicable programmer for approval.

94. Accordingly, the Court finds that Broadstripe is likely to prevail on Count 2 of the Complaint.

### D. Irreparable Harm.

95. Broadstripe is in the business of providing cable, internet and telephony services to customers in various regions across the country. As such, the value of Broadstripe's business operation—and the viability of any reorganization effort—is predicated in large part on the ability to obtain uninterrupted cable programming.

96. Broadstripe does not currently have contracts for all programming that it currently obtains or needs to obtain to service its customers, and certain contracts that it does have will expire over the next several months.

97. Broadstripe has a need, therefore, to participate in one or more Master Agreements through NCTC, including the Fox News Master Agreement.

98. NCTC has indicated that it intends to deny Broadstripe the right to participate in new or existing Master Agreements unless and until NCTC's prepetition claim is paid in full.

99. In the absence of binding contracts with certain programmers, Broadstripe is at risk that one or more programmers could terminate programming.

100. The loss of programming and potential resulting loss of customers could irreparably jeopardize both Broadstripe's enterprise value and its prospects for reorganization in chapter 11.

101. Indeed, Broadstripe's CFO, Chad Coben, testified that there were substantial risks to operating without enforceable programming contracts—whether in the form of Master Agreements or direct agreements—including the loss of subscribers. February 19 Transcript, at 149:25–150:21.

102. Conversely, the requested injunctive relief would enable Broadstripe to take steps to ensure the right to receive necessary programming through its participation in new and existing master agreements. Accordingly, the Court finds that Broadstripe could be irreparably harmed in the absence of the requested injunctive relief.

### E. Harm to NCTC.

103. Conversely, NCTC will suffer neither injury nor prejudice by allowing Broadstripe to participate in new or existing Master Agreements.

104. Notwithstanding that Broadstripe may be indebted to NCTC in the approximate amount of $3.4 million, there is no evidence in the record to indicate that NCTC is itself liable to programmers for any of the balance of that uncollected amount.

105. To the extent NCTC can be said to have suffered harm or prejudice by virtue of Broadstripe's nonpayment of its November 2008 and December 2008 invoices, that "harm" was fixed as of the Petition Date and can neither be lessened nor worsened by the approval (or denial) of the injunctive relief requested herein.

Requiring NCTC to perform its obligations under the Member Agreement in exchange for current payment by the Debtors on a postpetition basis will not cause harm to NCTC.

106. Moreover, there is no evidence in the record to indicate that any programmers have indicated to NCTC any concern with respect to the continued veracity of representations made by NCTC in the respective Master Agreement.

107. Accordingly, Broadstripe's continued participation in new or existing agreements will not prejudice NCTC.

108. Accordingly, the balancing of harms favors granting the requested injunctive relief.

**F. Public Policy.**

 109. "The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984).

110. Based on the irreparable harm to the Debtors that could ensue in the absence of injunctive relief, "[a]n injunction is proper to prevent the threatened extinction of a business." *Engine Specialties, Inc. v. Bombardier Ltd.*, 454 F.2d 527 (1st Cir.1972).

111. In the face of the potential for significant injury to the Debtors' business value and reorganization efforts and the potential loss of service to its customers, the public interest favors granting the requested injunctive relief to enable the Debtors to attempt to reorganize in chapter 11.

**G. Laches/Unclean Hands.**

112. NCTC raises as a defense that Broadstripe's request for injunctive relief is barred by the doctrines of laches and unclean hands. NCTC's defense, however, is not supported by the evidence.

113. To the contrary, NCTC's actions indicated an intent to stall the opt-in process through its failure to notify Broadstripe of the missing Member Participation Agreement for over two weeks, and its subsequent failure to notify Fox News of either its receipt of the System Participation Form or NCTC's concerns regarding the "good standing" representation.

114. Furthermore, although NCTC periodically conducts credit reviews where a member's creditworthiness is called into question, since the Petition Date NCTC made no such effort with respect to Broadstripe.

115. Accordingly, the requested injunctive relief is not barred by the equitable doctrines of laches or unclean hands.

Counsel for the Debtors is directed to submit a form of Order under certification of counsel.